[L.A. No. 31408. Oct. 21, 1982.]

AMERICAN NATIONAL INSURANCE COMPANY,
Plaintiff and Appellant, v.
FAIR EMPLOYMENT AND HOUSING COMMISSION,
Defendant and Respondent.

604

COUNSEL

Paul, Hastings, Janofsky & Walker, Robert F. Walker, William S. Waldo, George Petrow and Susan Gans for Plaintiff and Appellant.

Ilbert Phillips, Burke, Williams & Sorensen and Richard R. Terzian as Amici Curiae on behalf of Plaintiff and Appellant.

George Deukmejian, Attorney General, Richard D. Martland and Arthur C. de Goede, Assistant Attorneys General, Henry G. Ullerich and David S. Chaney, Deputy Attorneys General, for Defendant and Respondent.

Marilyn Holle, Daniel Brzovic, Mary Anne Ralyea, Elena H. Ackel, Marjorie Gelb, Prudence Kay Poppink, David Benjamin Oppenheimer, Joan Messing Graff, Rebecca I. McKee, Félix Velarde-Muñoz, Robert J. Funk and Deborah Kaplan as Amici Curiae on behalf of Defendant and Respondent.

OPINION

NEWMAN, J.—Succinctly, the proceedings below and facts concerning us here were summarized by the Presiding Justice of Divison Four in the Second District of the California Courts of Appeal as follows:

"This is an appeal by an employer from a judgment of the superior court upholding a decision of the State Fair Employment Practice Commission on review by administrative mandamus. The issue before the commission was whether the employer violated Labor Code section 1420 in refusing employment to a man because of his elevated blood pressure which did not impair his ability to work but which the employer believed, upon medical advice, would expose him to a greater than normal risk of disability or death. . . .

"In June 1975, American National Insurance Company (hereafter Company) employed Dale Rivard as a sales and debit agent, subject to approval of the home office. Between 1963 and 1968, Rivard had been employed by the Company for similar work. After six weeks, the Company terminated the employment because he did not meet the Company's health requirements for that position.

"The work of a sales and debit agent is to go door-to-door in a specified residential district selling insurance and collecting premiums. Agents are expected to meet certain sales quotas and to be current in the collection of premiums. The Company regards the work of a sales and debit agent as stressful, and as a matter of policy does not hire persons with elevated blood pressure for that work. When the Company terminated his 1975 employment, Rivard filed a complaint wih the commission alleging that he had suffered discrimination because of a physical handicap in violation of Labor Code section 1420.[1]

"Following an administrative hearing, the commission decided that the Company had discriminated unlawfully against Rivard and ordered his reinstatement with back pay. The Company then petitioned the superior court for review of the commission's decision. The court found that the commission's findings were supported by the evidence and concluded that 'high blood pressure is a protected physical handicap under the California Fair Employment Practice Act, Labor Code section 1410 et seq. [FEHA].' Accordingly, the superior court denied the Company's petition. This appeal is from that judgment."

---

"[1]At the time of the discharge, the pertinent part of Labor Code section 1420 read as follows: "'It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except when based upon applicable security regulations established by the United States or the State of California:

"'(a) For an employer, because of the race, religious creed, color, national origin, ancestry, physical handicap, or sex of any person, to refuse to hire or employ him or to refuse to select him for a training program leading to employment, or to bar or to discharge such person from employment or from a training program leading to employment, or to discriminate against such person in compensation or in terms, conditions or privileges of employment. . . .'"

SUBSTANTIAL EVIDENCE

■ The Company contends that the superior court erred *first,* because it refused to exercise its independent judgment on the evidence and, instead, used the substantial evidence test; *second,* because, regardless of the evidence, the FEHA does not apply to high blood pressure.

*Northern Inyo Hospital* v. *Fair Empl. Practice Com.* (1974) 38 Cal.App.3d 14, 23 [112 Cal.Rptr. 872] states: "Applying *Bixby* guidelines, Hospital's right to establish its employment practices and procedures and to impose conditions of employment can in no sense be termed a fundamental vested right. While the right to pursue a lawful business or occupation is a fundamental right [citing cases], there is no vested right to conduct a business free of reasonable governmental rules and regulations (see *Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 145-46 [93 Cal.Rptr. 234, 481, P.2d 242]; *Beverly Hills Fed. S & L Assn.* v. *Superior Court,* 259 Cal.App.2d 306, 316-317 [66 Cal.Rptr. 183])." We agree with that conclusion, and use here of the substantial evidence test therefore was appropriate. (Cf. *Stearns* v. *Fair Employment Practice Com.* (1971) 6 Cal.3d 205,211 [98 Cal.Rptr 467, 490 P.2d 1155].)

■ The trial court found as a fact that "[t]he record did not support petitioner's contention that the real party in interest could not perform his duties or that he could not perform such duties in a manner which would not endanger his health or safety or the health or safety of others." We agree with that finding, and the following excerpt from respondent's brief illuminates reasons that to us seem persuasive: "Despite appellant's doctor's claim that Rivard would not take his medicine, it was uncontroverted that the appellant had a general policy of excluding all persons from the debit agent category if they manifested high blood pressure. It was also uncontroverted that the appellant's policy had nothing to do with the ability of [Rivard] to do the job. Inasmuch as these facts were undisputed, the trial court did not have to apply any standard of review with respect to them. There was never any personal examination of Rivard by the appellant's physician. There was no prediction as to how long Rivard could work. Instead, appellant's physician assumed that once Rivard fit into a specific category, he was to be summarily disqualified. There was absolutely no evidence to qualify the employer's physician as a heart specialist. Indeed, at one point in the hearing the appellant's physician admitted to relying on morbidity tables which insurance companies use to adjust insurance rates. Such a person could hardly be considered an expert

in determining the possibility of danger to Rivard's health except in general and stereotypical terms."[2]

## PHYSICAL HANDICAP

■   What next we must decide is whether the Legislature intended that in certain cases high blood pressure may be a "physical handicap" under the FEHA. That statute proscribes unjustified discrimination based on "race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, sex, or age . . . ."[3]

Section 12926, subdivision (h) of the act tells us that the phrase "'[p]hysical handicap' *includes* [1] impairment of sight, hearing or speech, or [2] impairment of physical ability because of amputation or loss of function or coordination . . . ." (Italics added.) Because in that clause the word the drafters chose was "includes" (rather than "means" or "refers to," say) we infer that the Legislature did not endorse a restrictive definition. Instead it appears to have contemplated that the cognizant administrative officials and judges would consider *all* handicaps that are physical. Nonphysical handicaps—mental, economic, etc.—by implication are excluded.[4] Also excluded are various ills or defects that in fact are not handicapping; for example, certain kinds of digestive, respiratory, or skin disorders.

[2]At our oral argument, counsel for the Company contended that it had never conceded the lack of an individual evaluation of Rivard's condition. The issue then was explored in letters from both parties; and nothing cited by the Company contradicts the premise that (1) uncontrolled high blood pressure in the range of table 8 of the standard morbidity charts was a presumptive basis for rejecting prospective sales and debit agents, and (2) Rivard was rejected accordingly.

[3]When the action was filed the statute was known as the California Fair Employment Practice Act. (Former Lab. Code, § 1410 et seq.) In 1980 that statute was repealed and reenacted as part of the California Fair Employment and Housing Act. (Gov. Code, § 12900 et seq.) Here we refer sometimes to both statutes as "the act." Section references are to the Government Code unless otherwise indicated.

[4]In this opinion we address only the facts before us and engage in no analysis of the Legislature's implied exemption of individuals whose handicaps are nonphysical. Article I, section 8 of the California Constitution states: "A person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of *sex, race, creed, color, or national or ethnic origin.*" The phrase we have italicized is quite similar to that considered in *In re Cox* (1970) 3 Cal.3d 205, 216 [90 Cal.Rptr. 24, 474 P.2d 992]. It was added to the Constitution in 1974, after *Cox* had been decided. (See also the first paragraph of art. 2 of the Universal Declaration of Human Rights (Dept. of State Pub. No. 8961 (Nov. 1978) p. 4): "Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status." Cf. Lillich & Newman, International Human Right: Problems of Law and Policy (1979) pp. 56-57 ["The Legal Status of the Universal Declaration of Human Rights"].)

The Company concedes that the list of handicaps in section 12926, subdivision (h) does not "purport to be exhaustive . . . ." Yet its efforts to distinguish between covered and noncovered handicaps disclose how useless in this case are the maxims *ejusdem generis* and *noscitur a sociis.* For example, the Company says that "additional handicaps [i.e., those covered though not listed] must be *similar in nature* to those . . . set forth." (Italics added.) To us, "similar in nature" means (1) that the illness .or defect is physical, and (2) that it is handicapping.

Further, the Company urges, "the protected 'physical handicaps' are *major* physical impairments similar to those listed in the definition." (Italics in original.) By no means, though, do the Legislature's words imply that only major ills or defects are covered. Not all "impairment[s] of sight, hearing, or speech" are major; nor are all "impairment[s] of physical ability because of loss of function or coordination . . . ." To infer that nonmajor impairments are excluded would flout even the coverages that the statute expressly identifies.

Finally, says the Company, "a large number of physical impairments, such as epilepsy, cerebral palsy and arthritis, presumably are protected." Those three ills are physical, and often in fact they are handicapping. In neither the statute's words nor its legislative history, however, do we perceive an intent to include epilepsy, cerebral palsy, and arthritis while excluding ills such as high blood pressure.

What then is a "physical handicap" for purposes of the statute? Webster's tells us that a handicap is "a disadvantage that makes achievement unusually difficult." (Webster's New Internat. Dict. (3d ed. 1961) p. 1027.[5]) Obviously a condition of the body which has that disabling effect is a physical handicap.

Did the Legislature intend to cover only those health problems that are presently disabling? We think not. Indeed it made present inability to perform a particular job efficiently, safely, and without danger to health one of the few defenses to a ·charge of discrimination. (§ 12940, subd.

[5]"The distinction made [in 1980] by the World Health Organization between impairment, disability and handicap does more than clarify definitions. Historically, the main focus has been on the individual. This definition points to the socio-economic and structural obstacles that hinder participation. The acceptance of this perspective means that all of society is responsible for creating equal opportunity. Particularly, it emphasizes that handicaps are the social disadvantages that may arise from either an impairment or a disability; thus *handicap is a loss or limitation of opportunities to take part in the normal life of the community on an equal level with others.*" (Rep. of Advisory Com. for the Internat. Year of Disabled Persons (7 Oct. 1981) U.N. Doc. No. A/36/471/Add. 1, p. 27, italics added.)

(a)(1).) The law clearly was designed to prevent employers from acting arbitrarily against physical condition that, whether actually or potentially handicapping, may present no current job disability or job-related health risk. (See *Sterling Transit Co.* v. *Fair Employment Practice Com.* (1981) 121 Cal.App.3d 791, 794, 796 [175 Cal.Rptr. 548].)

To limit "handicap" to present disabilities would defy logic. In effect that would proscribe discrimination based on current, manifest, physical disfunction while allowing exclusion on the basis of conditions—like high blood pressure—that may handicap in the future but have no presently disabling effect. We should not conclude that the Legislature intended any such anomalous result.

The Company argues next that hypertension is more appropriately deemed a "medical condition" than a handicap. It notes that the Legislature prohibited discrimination on grounds of "medical condition" but curiously restricted the reach of that term to cured or rehabilitated cancer. (See § 12926, subd. (f): "'Medical condition' means any health impairment related to or associated with a diagnosis of cancer, for which a person has been rehabilitated or cured, based on competent medical evidence.")

We need not decide whether that bizarre definition implies that an unrehabilitated and uncured cancer patient is never physically handicapped. Even more bizarre, though, would be our presuming a legislative conclusion that high blood pressure is always a medical condition, never a physical handicap, and thus is unprotected by the statute. Common knowledge is to the contrary; high blood pressure is physical, and often it is handicapping. (See too § 12993, subd. (a): "The provisions of this part shall be construed liberally for the accomplishment of the purposes thereof . . . ." Cf. § 12920: "It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of . . . physical handicap. . . .")

The judgment is affirmed.

Bird, C. J., Kaus, J., Broussard, J., and Reynoso, J., concurred.

**MOSK, J.**—I dissent.

In my view the Legislature has not defined "physical handicap" within the meaning of the antidiscrimination law to include ordinary high blood pressure, and respondent commission does not have the power to rewrite the statute to satisfy its belief that such a medical condition should be covered by that law.

The California Fair Employment and Housing Act makes it an "unlawful employment practice" for an employer to discriminate in hiring, training, discharge, or compensation of employees because of "race, religious creed, color, national origin, ancestry, *physical handicap, medical condition, marital status, or sex* . . . ." (Italics added.) (Gov. Code, § 12940, subd. (a).) Contrary to similar laws in some other states, however, in California the Legislature has provided an explicit definition of the phrase "physical handicap" as used in this statute: "'Physical handicap' includes impairment of sight, hearing, or speech, or impairment of physical ability because of amputation or loss of function or coordination, or any other health impairment which requires special education or related services." (*Id.*, § 12926, subd. (h).) It is this statutory definition that is at issue here.

The majority first make much of the fact that the statute says "'Physical handicap' includes," rather than "'Physical handicap' means," and invoke the general rule that the verb "includes" is ordinarily a word of enlargement rather than limitation. (See, e.g., *People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 639 [268 P.2d 723].) But the rule, which is no more than an aid to construction, is of little if any weight when the Legislature has chosen not to use these terms consistently in the same statute. Such is the case here. Although subdivision (f) (defining "medical condition") uses "means" as a word of limitation, subdivision (c) (defining "employer") uses "includes" for that same purpose, and subdivision (a) (defining "age") uses yet another term, "refers." Other definitional sections of the act are equally inconsistent. (See §§ 12925, 12927.) And in still further provisions the Legislature makes it clear that it is using "includes" as a term of enlargement by adding the phrase, "including, *but not limited to* . . . ." (See §§ 12961, 12970, subd. (a).)[1] In these circumstances, no inference can fairly be drawn one way or the other from the Legislature's use of the single word "includes" in defining physical handicap in this statute.

---

[1]Other states have adopted statutory definitions of physical handicap that do use the phrase "including, but not limited to." (See, e.g., *Matter of Unlawful Employment Practices, etc.* (1977) 280 Ore. 163 [570 P.2d 76, 77]; *Providence Journal Company* v. *Mason* (1976) 116 R.I. 614 [359 A.2d 682, 684, fn. 2.])

The majority next propose their own definition of "physical handicap," but they wrench the terms out of context and look no further than Webster's dictionary. Thus they note the obvious—that "nonphysical" is the opposite of "physical"—and infer that the statute excludes only "nonphysical" handicaps such as mental, economic, and cultural disabilities; all other medical conditions are included, the majority assert, provided merely that they are "handicapping" in any degree, however slight. Relying on the general dictionary definition of "handicap" as "a disadvantage that makes achievement unusually difficult," the majority conclude that "a condition of the body which has that disabling effect is a physical handicap." (*Ante,* p. 609.)

Although the majority purport to give effect to section 12926, their sweeping definition violates a number of canons of statutory construction; most important, it ignores the legislative intent apparent from viewing the statute as a whole and in the light of the rest of the legislation of which it is an integral and inseparable part. (*Moyers* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230-231 [110 Cal.Rptr. 144, 514 P.2d 1224], and cases cited.) Under settled principles, the analysis should begin with the words of the statute itself. Because high blood pressure is not an "impairment of sight, hearing, or speech," the majority must mean that it is an "impairment of physical ability because of amputation or the loss of function or coordination." And because high blood pressure is not an "amputation" or "loss of coordination," the majority must mean that it is a "loss of function." But the majority in effect define physical handicap simply as an "impairment of physical ability," and thus read out of the statute the express requirement that such impairment must flow from a "loss of function." Indeed, the majority fail to offer any definition of "impairment of physical ability" that would include the actual, known effects of high blood pressure. Perhaps the majority is silent on the point because they realize that in most people high blood pressure can now be successfully controlled by medication and, while so controlled, does not result in an "impairment of physical ability" in any reasonable meaning of that phrase. (See *Burgess* v. *Joseph Schlitz Brewing Co.* (1979) 298 N.C. 520 [259 S.E.2d 248, 253] [glaucoma corrected by eyeglasses is not a disability protected by the statute.]

Secondly, the majority's treatment of the phrase "loss of function" makes the rest of the statute surplusage. If every "impairment of physical ability" amounts to a protectible physical handicap, that phrase alone

would include such major abnormalities as amputation and loss of sight, hearing, or speech, thus rendering superfluous the clauses of the statute which specifically list those impairments in the definition of physical handicap.

The same reading also expands the meaning of the phrase "loss of function" far beyond that intended by the Legislature. The statute identifies three classes of physical handicaps protected by the act.[2] The first class is a total or partial loss of three principal modes of human communication, i.e., sight, hearing, and speech. This was an easy category for the Legislature to define, including as it does such traditional handicaps as blindness or impaired vision, hearing loss, and speech impediments.

More difficult to define was the second type of handicap that the act was intended to cover. When the bill defining physical handicap was first introduced, it described this category simply as "being crippled." (Assem. Bill No. 1126 (1973-1974 Reg. Sess.) § 3.) The phrase was evidently out-dated, and prior to final passage it was amended into its present form. Yet in its old-fashioned way it did express the Legislature's intent: in ordinary usage and common understanding, to be "crippled" means to suffer from impaired physical mobility because of the total or partial loss of use of one or more limbs, extremities, or major joints. In most cases such impairment results when the limb is missing (e.g., because of birth defect or amputation), or when the limb is intact but the person cannot move it because of paralysis caused by disease (e.g., polio, multiple sclerosis, muscular dystrophy, or stroke) or trauma (e.g., paraplegia or quadriplegia) or because of immobility of the joint (e.g., degenerative arthritis), or when the limb is movable but the person cannot always

---

[2]For purposes of analysis, the definition may conveniently be broken down into its component parts: i.e., "physical handicap" includes:
(1) impairment of
  (a) sight, or
  (b) hearing, or
  (c) speech; or
(2) impairment of physical ability because of
  (a) amputation, or
  (b) loss of function, or
  (c) loss of coordination; or
(3) "any other health impairment which requires special education or related services."
  We may put aside the last category in this case. Despite the statute's somewhat loose use of the word "other" it is clear that the third clause is an alternative to, rather than a modifier of, the first two clauses of the definition. A health impairment that requires "special education or related services" is simply one which qualifies the person for a "special education program," including classes for handicapped children. (See Ed. Code, § 56000 et seq.) The clause thus refers to a particular class of persons with physical handicaps, and is not intended to restrict the meaning of the remainder of the definition.

control or coordinate its motions (e.g., because of cerebral palsy, epilepsy, or Parkinson's disease).

In substituting the present definition for the phrase "being crippled," the Legislature merely restated this traditional meaning in contemporary words. Viewed in the light of its history, therefore, "loss of function" does not bear the majority's broad meaning of *any* impairment in the functioning of *any* part of the body; it means, rather, a loss of mobility or strength (i.e., "impairment of physical *ability*") resulting from a total or partial deprivation of the use of a major structural component of the body, caused by a substantial impairment analogous to an amputation or permanent failure of coordination or control.

I am fully aware, of course, that when the statute is thus understood it excludes a number of other health problems that could loosely be called "handicaps." But that exclusion is a legislative decision: an examination of the rest of section 12926 shows that restrictive definitions are not unususal in this act. Thus although the act bars job discrimination on the ground, inter alia, of "age" and "medical condition" (§ 12920), it then proceeds to give each term a narrow and artificial meaning. "Age" is defined as being 40 or more years old (§ 12926, subd. (a)), thereby making it lawful to engage in job discrimination against young people on the ground of *their* age. Even more surprising, "medical condition" is defined as only one disease—cancer—and in only one stage, unfortunately infrequent, of its progression—i.e., when the cancer victim has been "rehabilitated or cured."[3] The strong implication of the latter definition, fully confirmed by its legislative history,[4] is that the Legislature did not intend that other "medical conditions"—such as high blood pressure—be covered by the act as it is presently worded. To read them back into the act in the guise of "physical handicaps" does violence to that intent.[5]

---

[3]"'Medical condition' means any health impairment related to or associated with a diagnosis of cancer, for which a person has been rehabilitated or cured, based on competent medical evidence." (*Id.*, § 12926, subd. (f).)

[4]As first introduced, the bill prohibiting discrimination on the ground of "medical condition" provided an extremely comprehensive definition of the term, including "any past, present, or possible future disease, disability, condition, diagnosis, prognosis, or impairment of health" (Assem. Bill No. 1194 (1975 Reg. Sess.) § 3). In the process of enactment it was subsequently limited to "any health impairment for which a person has been rehabilitated or cured," and was ultimately restricted to cancer alone.

[5]Similarly, in *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 490-491 [156 Cal.Rptr. 14, 595 P.2d 592], we hold that it would violate legislative intent to broadly read the act's prohibition against discrimination on the ground of "sex" to include discrimination against homosexuals because of the sex of their partner.

Finally, the majority fall back on the general statutory provison that the act is to be "liberally construed." (§ 12993, subd. (a).) A rule of liberal construction, however, "'should not blindly be followed so as to eradicate the clear language and purpose of the statute'" (*Wheeler* v. *Board of Administration* (1979) 25 Cal.3d 600, 605 [159 Cal.Rptr. 336, 601 P.2d 568]; see also *Justus* v. *Atchison* (1977) 19 Cal.3d 564, 579-580 [139 Cal.Rptr. 97, 565 P.2d 122]). Even less helpful is the introductory declaration to the statute, relied on by the majority, to the effect that it is the public policy of this state to "protect and safeguard the right of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of . . . physical handicap" (§ 12920). Such reliance begs the question of the meaning of the term "physical handicap," which the Legislature does not define in the policy declaration but in the specific statute now before us (§ 12926, subd. (h)).

Although the majority does not find it necessary to reach the point, I cannot refrain from commenting on a major contention advanced by the commission in this case, to wit, that its reading of the statute should be adopted because it comports with "longstanding administrative construc-tion" followed by "legislative acquiescence." The claim is not only without merit, it also exposes a startling case of an administrative agency rewriting a legislative definition to suit its opinion of what its jurisdiction should be but, under the statute, is not.

To begin with, the commission's construction of this statute is not "longstanding" but both recent and ad hoc. The statutory definition of physical handicap was added in 1973, and the present litigation began when Rivard filed his complaint in 1975. It was not until 1978, however, that the commission published its initial "guidelines" defining physical handicap; and it was not until 1980—five years after this litigation began—that it adopted its first regulations on the topic, formalizing those guidelines. Surely it is bootstrapping when an agency, *after* being haled into court to defend its interpretation of a statute, proceeds to adopt a regulation embodying that view and then relies on the same regulation as evidence of "longstanding administrative construction." We recently reiterated our admonition that we will give little or no weight to such an ad hoc expression of an administrative "expertise." (*Jones* v. *Tracy School Dist.* (1980) 27 Cal.3d 99, 107 [165 Cal.Rptr. 100, 611 P.2d 441].) The reason, of course, is that "The self-interest inherent in such a process removes from the [regulation] the appearance of impartiality necessary to justify any reliance by the court." (*Carmona* v. *Division of Industrial*

*Safety* (1975) 13 Cal.3d 303, 312, fn. 8 [118 Cal.Rptr. 473, 530 P.2d 161].)[6]

Even more distressing is the fact that the interpretation adopted by the commission would wholly "rewrite the statute in the guise of construing it" (*Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148]). As discussed above, the statute defines "physical handicap" in part as "impairment of physical ability because of . . . loss of function," and that clause has a limited meaning when read in context and in the light of history. The commission claims that its regulation embodies an "administrative construction" of the same clause of the statute. Yet upon closer examination it appears that the regulation actually redefines the clause to include a list of health problems that is positively breathtaking in scope—indeed, that covers virtually every possible disorder of every known part of the human body.[7]

The wording of the regulation is so expansive it compels me to wonder what statute it really implements; I cannot believe the commission found all these ailments in the modest clause of the California act now before us.[8] For example, under this regulation an ulcer would qualify as a protected

[6]The commission also relies on 14 of its own decisions in which, it says, it applied the broad definition of "physical handicap" embodied in its guidelines and regulations. Once again, however, the bootstrapping effect plainly appears, as each of the decisions dates from 1978 or later.

[7]Thus the regulation defines "impairment of physical ability due to loss of function" as "Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin and endocrine." (Cal. Admin. Code, tit. 2, div. 4, § 7293.6(d).)

[8]Again the definition may be broken down into its component parts for ease of analysis: the regulation declares that "impairment of physical ability because of loss of function" means:
  (1) any physiological disorder, condition, or
  (2) any cosmetic disfigurement, or
  (3) any anatomical loss, affecting one or more of the following body systems:
    (a) neurological
    (b) musculoskeletal
    (c) special sense organs
    (d) respiratory, including speech organs
    (e) cardiovascular
    (f) reproductive
    (g) digestive
    (h) genitourinary
    (i) hemic and lymphatic
    (j) skin
    (k) endocrine.
The sole exceptions recognized by the commission are conditions that are mental rather than physical in origin, or voluntarily induced, or temporary.

physical handicap because it is a "physiological disorder" affecting the "digestive system"; a chronic allergy or sinus condition would also qualify, being a "physiological condition" affecting the "respiratory system"; migraine headaches, in one view, are a "physiological disorder" affecting the "neurological system"; varicose veins or warts are a "cosmetic disfigurement" affecting the "skin system"; and a hysterectomy or vasectomy is an "anatomical loss" affecting the "reproductive system."[9] Surely the Legislature did not intend, by the nine words of this clause, to authorize disgruntled job-seekers or discharged workers to claim illegal employment discrimination for each of "the thousand natural shocks that flesh is heir to."

A strong clue to the origin of this regulation appears in the fact that it contains some obvious redundancies. Thus it expressly includes, among the impairments of "physical ability because of loss of function," impairments of sight and hearing (i.e., any disorder or loss affecting "special sense organs") and of speech (i.e., any disorder or loss affecting the respiratory system, "including speech organs"). (See fn. 8, *ante.*) Yet the same impairments of sight, hearing and speech are expressly defined as physical handicaps by other, more specific portions of the regulation.[10] Again, the regulation further defines impairment of "physical ability because of loss of function" to include any "anatomical loss" affecting the musculoskeletal system or the skin. (See fn. 8, *ante.*) Yet exactly the same impairment is also declared to be a physical handicap by a more specific part of the definition.[11]

These redundancies suggest that the commission borrowed the language of its regulation from a source that was largely inappropriate for the purpose. Although the commission does not acknowledge this source in its briefs, it appears to be certain federal regulations implementing portions of the Rehabilitation Act of 1973 (29 U.S.C. § 701 et seq.): in these respects, the California regulation has obviously been copied directly from the

[9]The majority apparently join me in disapproving this regulation, at least in part: they would exclude from the definition of physical handicap "various ills or defects that in fact are not handicapping; for example, certain kinds of digestive, respiratory, or skin disorders." (*Ante,* p. 608.)

[10]Subdivision (a)(1) defines physical handicap to include any "Impairment of sight, hearing or speech"; and subdivision (b) refines that definition to include "Any physiological disorder or conditon, cosmetic disfigurement, or anatomical loss affecting seeing, hearing, or speaking."

[11]Subdivision (a)(2)(A) defines physical handicap to include any "impairment of physical ability because of . . . Amputation"; and subdivision (c) defines that phrase to mean "Any anatomical loss affecting the skin or the musculoskeletal body system."

corresponding provisions of the federal regulations.[12] It is true there is nothing inherently wrong in a state administrative agency adopting as its own the language of a federal regulation when appropriate—although in so doing it should at least take care to adapt the language to its own needs, so as to avoid the kind of redundancies identified above. But it is *not* proper for the agency to do so when the federal statute implemented by the regulation is significantly different from the California statute.

That is the case at hand. In sharp contrast to the specific categories of physical impairments listed in the California statutory definition (fn. 2, *ante*), the federal statute declares generally that a "handicapped individual" is, for its purposes, any person who has "a physical or mental impairment" that "substantially limits one or more of such persons' major life activities," or who "has a record" of such an impairment, or who is merely "regarded as having" the impairment. (29 U.S.C. § 706(7)(B).) The commission apparently wishes that the wording of the California act were as broad as the federal statute, so that its jurisdiction would be coextensive with that of the federal agency.[13] But the commission does not have the power to expand its jurisdiction by the device of adopting a regulation enlarging the scope of its statutory authorization.

It is settled that "Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations." (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697], and cases

[12]The California definition (fn. 7, *ante*) is identical to the federal definition adopted in 1977 (42 Fed. Reg. 22678, now 45 C.F.R. § 84.3 (j)(2)(i)(A) (1980)), which declares that "physical impairment" is "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; . . ."

The quoted federal regulation implements the general statutory bar against discrimination on the basis of handicap in programs or activities receiving federal financial assistance. (29 U.S.C. § 794.) Somewhat more in point is a regulation adopted in 1978 (43 Fed. Reg. 12295, now 29 C.F.R. § 1613.701 et seq. (1981)), which implements the specific statutory bar against dicrimination on that ground in the field of federal employment. (29 U.S.C. § 791.) In the latter regulation the definition of "physical impairment" (29 C.F.R. § 1613.702(b)(1)) is identical to that just quoted, except that it omits one of the long list of body systems covered (i.e., "respiratory, including speech organs"). The reason, if any, for this curious omission has not been divulged to us.

[13]In its regulation (§ 7293.6(j)) the commission adopted verbatim the foregoing definition of "handicapped individual" found in the federal statute and regulations (see 29 C.F.R. § 1613.702(a) (1981); 45 C.F.R. § 84.3(j)(1) (1981)). Indeed, the commission took not only the definitional provisions but much of the rest of its regulation from the federal regulations as well. In so doing, however, it further rewrote the California act in respects not in issue here.

cited.) And this is the rule even when, as here, "the statute is subsequently reenacted without change." (*Whitcomb Hotel, Inc.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 753, 757-758 [151 P.2d 233, 155 A.L.R. 405], and cases cited.) The reason for this rule is clear: "We recognize, of course, that an administrative agency charged with carrying out a particular statute must adopt some preliminary construction of the statute as a basis upon which to proceed. It is likewise true that the administrative interpretation of a statute will be accorded great respect by the courts and will be followed if not clearly erroneous. But such a tentative administrative interpretation makes no pretense at finality and it is the duty of this court, when such a question of law is properly presented, to state the true meaning of the statute finally and conclusively, even though this requires the overthrow of an earlier erroneous administrative construction. The ultimate interpretation of a statute is an exercise of the judicial power. The judicial power is conferred upon the courts by the Constitution and, in the absence of a constitutional provision, cannot be exercised by any other body." (Citations omitted.) (*Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321, 325-326 [109 P.2d 935].)

We have recently and repeatedly invoked this rule in a variety of settings. (See, e.g., *J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1. 29 [160 Cal.Rptr. 710, 603 P.2d 1306]; *Mosk* v. *Superior Court* (1979) 25 Cal.3d 474, 499 [159 Cal.Rptr. 494, 601 P.2d 1030]; *Sanchez* v. *Unemployment Ins. Appeals Bd.* (1977) 20 Cal.3d 55, 67 [141 Cal.Rptr. 146, 569 P.2d 740]; *Bright* v. *Los Angeles Unified Sch. Dist.* (1976) 18 Cal.3d 450, 459, 464 [134 Cal.Rptr. 639, 556 P.2d 1090]; *Cooper* v. *Swoap* (1974) 11 Cal.3d 856, 864 [115 Cal.Rptr 1, 524 P.2d 97]; *Gibson* v. *Unemployment Ins. Appeals Bd.* (1973) 9 Cal.3d 494, 498, fn. 6 [108 Cal.Rptr. 1, 509 P.2d 945]; *Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 681 [94 Cal.Rptr. 279, 483 P.2d 1231].)

We should therefore refuse to follow the commission's overbroad administrative construction of the act's definition of "physical handicap." I do not doubt, of course, that the commission is motivated by a sincere desire to implement the salutary purposes of this legislation. Nor do I underestimate the practical difficulties faced by the commission in doing so. But in California the prohibition against employment discrimination is wholly a creature of statute: the provisions of this act "are in no sense declaratory of preexisting common law doctrine but rather include areas and subject matters of legislative innovation, creating new limitations on an employer's right to hire, promote or discharge its employees." (*Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) *supra*, 24 Cal.3d 458, 490.) If the definition of physical handicap set forth in the act is found to be

too limited for its purposes in the light of today's medical knowlege, it is not for the commission but for the Legislature to rewrite it. In other settings the Legislature has shown that it knows how to do so with great precision. (See, e.g., Veh. Code, § 22511.5, subd. (a).)

For the reasons stated, I would hold that the challenged decision of the commission was in excess of its jurisdiction, and that the superior court erred in ruling otherwise.

Richardson, J., concurred.

Appellant's petition for a rehearing was denied November 24, 1982. Newman, J., did not participate therein. Richardson, J., was of the opinion that the petition should be granted.