[No. B057761. Second Dist., Div. Two. Apr. 24, 1992.]

KATHLEEN REBECCA HEGWER, Plaintiff and Appellant, v.
BOARD OF CIVIL SERVICE COMMISSIONERS OF THE CITY OF
LOS ANGELES, Defendant and Respondent;
DONALD O. MANNING, as Chief Engineer, etc., Real Party in Interest
and Respondent.

## COUNSEL

Marr & Marchant, Cecil Marr and Diane Marchant for Plaintiff and Appellant.

James K. Hahn, City Attorney, Frederick N. Merkin, Assistant City Attorney, and Molly Roff-Sheridan, Deputy City Attorney, for Defendant and Respondent and for Real Party in Interest and Respondent.

## OPINION

**FUKUTO, J.—**

### Introduction

Appellant, Kathleen Rebecca Hegwer, is a paramedic for the Los Angeles City Fire Department (hereinafter, the Department). She sought judicial review of a Los Angeles City Board of Civil Service Commissioners' (hereinafter, the Board) decision which affirmed two suspensions without pay imposed for her failure, on two different occasions, to maintain proper levels of physical fitness and lose two pounds per month as required by the Department's compulsory weight control program.[1] This appeal is from the superior court's denial of the petition for peremptory writ of mandate. We affirm the judgment.

### The Department Weight Control Program

For many years, the Department has enforced body weight limitations on its firefighters and emergency medical services (EMS) employees as a component of an overall physical fitness program. The Department's Manual of Operation declares in capital letters that "PROPER WEIGHT CONTROL IS A CONDITION OF EMPLOYMENT WITH THE LOS ANGELES CITY FIRE DEPARTMENT." (Los Angeles Fire Department Manual of Operation (rev. Dec. 1987) (hereinafter, Manual of Operation).) New Department hirees must meet

---

[1] Unless otherwise indicated, use of the designation "City" refers to the City of Los Angeles or its agencies other than the Department.

obesity standards for trainee paramedics and firefighters promulgated by the City Personnel Department. Incumbent firefighters and paramedics are required to participate in the Department's physical fitness training program unless excused by written medical restriction by a private or City physician. They are also subjected to periodic examinations to ascertain fitness levels and compliance with maximum allowable body weights set by the Department based on acceptable ranges of body fat and weight established for each employee by the Central Receiving Clinic of the Medical Services Division of the City Personnel Department (hereinafter, CRC).

The CRC determines acceptable weight ranges for female paramedics in the following manner. The female employee's percentage of body fat is calculated using the Durnin skin fold test, a test with a range of accuracy from 3½ to 4½ percent. Using a maximum desirable female body fat standard of 25 to 30 percent, depending on the subject's height, body type and age, CRC medical personnel then calculate a maximum acceptable body weight for the individual. The 25 to 30 percent maximum acceptable female body fat standard utilized by the CRC is based on clinical studies performed in the university setting, and would now be considered a rather lenient standard according to the most current scientific obesity studies and literature.[2]

A paramedic or firefighter whose weight increases more than six pounds above his or her maximum allowable weight is referred for mandatory participation in the Department's weight control program. The overweight employee is required to lose two pounds per month until he or she reaches his or her maximum allowable weight, and maintains that weight for three consecutive monthly weight checks. The requirement of two pounds per month weight loss is extremely safe and well within medical standards of reasonableness for unsupervised weight loss.

An employee's failure to achieve the monthly weight loss goals set by the weight control program results in the imposition of disciplinary measures of increasing severity, including, after repeated failures, substantial periods of

---

[2]The maximum acceptable weight for male Department paramedics is established in a similar manner. However, for male paramedics, percentage of body fat is measured using the Wright and Wilmore scale, which is not statistically valid when used to measure body fat in females. Since 1988, the maximum allowable weight for the Department's firefighters is derived from a height-weight chart generated from data collected during a 1985 study of the average heights, weights, and body fat percentages of Department employees. The firefighters' union approved of the use of the height-weight chart to set maximum allowable body weights for its membership; the paramedics' union did not. Consequently, body fat composition analysis is still used to determine maximum allowable weight standards for paramedics. Firefighters who disagree with the maximum allowable weight established by height-weight chart may request reevaluation at the CRC through body fat composition testing.

suspension without pay. Mandatory participation in the program, and the setting of an employee's maximum allowable weight, is solely dependent on assessment of the employee's weight and percentage of body fat and is not directly tied to job performance.

An employee who feels that he or she has been assigned an unrealistic maximum allowable weight may request weight reevaluation at the CRC, or may seek evaluation by a private weight clinic or physician. The opinions of an employee's private physician or clinic are not binding on the Department but will be taken into consideration in the setting of the employee's periodic and maximum acceptable body weight goals.

The Department's physical fitness and weight control programs have been evaluated and updated on the average of every two years since 1971. The Department has not conducted any tests or studies to determine the precise body fat levels at which job performance of paramedics is actually impaired.

In 1983, the president of appellant's union, United Paramedics of Los Angeles (UPLA), signed a letter of agreement recognizing the "necessary and beneficial" nature of the weight control program and agreeing that any chief officer of the Department had authority to enter a member into the program. This differed from the previous practice of requiring a doctor's order for entry into the program. UPLA has since sought unsuccessfully to eliminate altogether the use of weight standards, and to instead require that the Department accommodate, or place on medical leave with pay, or provide workers' compensation or disability retirement benefits to any employee whose obesity is found to impact job performance. However, as of the dates of appellant's civil service hearings, the 1983 letter of agreement had been neither modified nor rescinded and was still in full force. The Manual of Operation, which contains provisions for enforcement of the weight control program, is a part of UPLA's memorandum of understanding (MOU).

### Appellant's Case History

Appellant applied for employment as a paramedic and was given a preemployment physical examination in May 1979. Based on the City Department of Personnel's entrance standards then in use, appellant's hiring was "deferred" for mild obesity. Appellant, whose height is between 63 and 64 inches, was directed to return upon reducing her weight to less than 132 pounds. She was hired on May 5, 1980, weighing 130 pounds.

Appellant first entered the weight control program on December 15, 1982, having exceeded her maximum allowable weight of 140 pounds by approximately 25 pounds.[3] On May 24, 1983, she was counselled following her failure to achieve her monthly weight goal of 157 pounds. On December 24, 1983, appellant was issued a "Notice to Improve" for falling short of her monthly goal of 151 pounds.[4] After maintaining her maximum allowable weight of 140 pounds for 2 months, on December 22, 1984, appellant recorded a weight gain of 20 pounds and was given an official reprimand and a 6-month exemption from the requirement that she eat with the organized mess.[5]

Subsequently, appellant's request for reevaluation of her weight requirements was approved, and her maximum allowable weight was adjusted upward to 150 pounds. On June 25, 1985, appellant weighed 194 pounds, a weight gain of 27 pounds over her previously recorded weight. She received a one-day suspension. Appellant's performance evaluation report for the period ending July 16, 1985, gives her an overall rating of satisfactory, but notes that improvement is needed in the areas of physical fitness, agility, and personal appearance.

On April 4, 1986, appellant weighed 179 pounds, with a monthly goal of 176. She received a four-day suspension. Appellant's performance evaluation report for the period ending June 24, 1986, is somewhat mixed. The rater comments: "Due to Hegwer's excessive weight she has lost some of her agility needed to perform her duties as a paramedic. Examples of this include working in tight areas such as automobiles and small bedrooms, moving patients down narrow hallways, over furniture, and through doorways. With a lose [sic] of weight Hegwer would gain agility and stamina and be more affective [sic] as a paramedic."

On June 2, 1987, appellant met her maximum allowable weight goal of 150 pounds. On November 11, 1987, at her third consecutive weight maintenance check, however, she weighed 198 pounds. On December 1, 1987, weighing 216 pounds, appellant was reevaluated by the CRC and assigned a maximum allowable weight of 160 pounds.

On May 16, 1988, an 8-day suspension was recommended because appellant had posted a 48-pound weight gain on November 11, 1987, and a

---

[3]At that time, the Department used a more stringent standard and determined appellant's maximum allowable weight based on a body fat percentage of only 23 percent.

[4]Appellant's weight control progress report for August 20, 1983 notes that, on that date, she was under the care of a physician and taking thyroid medication.

[5]A performance evaluation report covering the period from February 12, 1983, to December 28, 1983, finds appellant's job performance satisfactory but notes that she has lost only 10 pounds despite her participation in the weight control program for 1 year.

12-pound weight gain on January 11, 1988. The notice of suspension was eventually rescinded and appellant was verbally offered several options to address her weight problem, including transfer to a less stressful, administrative position.[6] The evidence suggests that possibly appellant declined the offer of a transfer because she believed it would be a violation of UPLA's MOU.

On July 9, 1988, appellant posted a weight gain of 17 pounds, reaching a weight of 225 pounds. She was given the Kasch 12-inch bench test to determine her level of fitness. Appellant's one-minute heart recovery rate was found to be 155 beats per minute, which means that appellant's level of fitness was "very poor" according to the heart recovery rate charts contained in the Department's physical fitness manual. Appellant was therefore referred to the medical liaison unit for medical followup and ordered to participate in "Level I warm-up flexibility and cardiovascular exercises only until such time as having been cleared for full participation."[7]

On August 16, 1988, appellant's physical conditioning was evaluated at the CRC. She failed to complete the third stage of a treadmill cardiac stress test because she was fatigued and had reached or exceeded her maximum heart rate. Most women complete at least the third stage, and some are able to continue into the fourth stage. After performing both Kasch bench step and treadmill tests, appellant's heart rate also took an abnormally long time to return to baseline or resting levels. Appellant exhibited some cardiac irregularity, but not of a serious character. The examining physician found no "underlying cardiac problem for which work restrictions would be necessary" but noted that appellant would "be expected to have less endurance & perform job task[s] at a slower rate than others." The clinic report for August 16 also referred to evidence of appellant's probable thyroid disorder, and recommended advice and referral to her physician for further evaluation.

### History of the Instant Litigation

Following her August 1988 evaluation, appellant continued to gain weight. On January 17, 1989, she weighed 231 pounds, 10 pounds over her

---

[6] On appellant's November 11, 1987, weight control progress report, appellant's district commander had opined that the extremely high call-load of appellant's work assignment contributed significantly to her medical disorder and excessive weight gain.

[7] In appellant's performance evaluation report for the period ending July 21, 1988, the rater stated that, overall, appellant's work as a paramedic was "commendable." He also commented, however, that appellant had not taken the initiative with respect to physical conditioning or participation in the Department's exercise program, and improvement was definitely needed in this area. Commander Russell Weck, who reviewed the evaluation of appellant's immediate supervisor and added several critical comments, put it more strongly: "PIII Hegwer simply does not participate in the Departments [sic] Physical Fitness Program. In my opinion, because of her excessive weight her physical agility and cardiovascular endurance is compromised."

monthly weight goal and 71 pounds over her maximum allowable weight. An eight-day suspension was imposed, based upon appellant's alleged violation of sections 10(f) and 12(i) of the Department's rules and regulations,[8] and section 3/5-60.24.c of the Manual of Operation. Section 10(f) requires that members "Familiarize themselves with and be obedient to the rules, regulations, practices and procedures of the Department." Section 12(i) requires that members "Keep themselves in proper physical condition necessary to perform the duties of their position." Section 3/5-60.24.c of the Manual of Operation requires that weight control program participants lose weight at a minimum rate of two pounds per month in pursuance of the total weight loss recommended by the CRC physician.

Appellant appealed the eight-day suspension to the Board and on July 25-26, and August 15, 1989, a hearing was held before Hearing Examiner Lisa Rich.[9] Before a decision could be rendered regarding the eight-day suspension, a second, fourteen-day suspension was imposed following appellant's failure to meet monthly weight reduction goals on July 25, 1989 and August 30, 1989; on those dates, appellant weighed 225 pounds and 229 pounds, respectively. Appellant appealed the 14-day suspension to the Board and on November 13, 27 and 29, 1989, a hearing was held before Hearing Examiner Richard Anthony. In both cases, appellant admitted the failure to lose weight. She contended, in essence, that her obesity did not amount to a failure to keep herself in proper physical condition necessary to perform the duties of a paramedic, and that the failure to lose weight, standing alone, was not misconduct sufficient to support the disciplinary measures imposed.

On January 4, 1990, Hearing Examiner Anthony issued a report recommending that the Board find appellant in violation of section 10(f) of the Rules and Regulations and section 3/5-60.24.c of the Manual of Operation, and sustain the penalty of suspension for 14 days imposed for the July and August 1989 weight violations. Hearing Examiner Anthony found that the Department had not sustained the charge that appellant had violated section 12(i) of the Rules and Regulations, which requires that all members keep themselves in proper physical condition necessary to perform the duties of their position.

On January 22, 1990, Hearing Examiner Rich issued a report recommending that the Board find appellant in violation of both sections 10(f) and 12(i) of the Rules and Regulations and section 3/5-60.24.c of the Manual of Operation, and sustain the penalty of suspension for eight days imposed for the January 1989 weight violation.

---

[8]Formally known as Los Angeles Fire Department Rules and Regulations (hereafter, Rules and Regulations), established in accordance with section 78 of the Los Angeles City Charter.

[9]Appellant's shorter suspensions were not appealable to the Board.

Appellant filed exceptions to the two hearing examiners' reports, asserting, among other objections, that discipline imposed for the failure to meet physical criteria which were not validated constituted handicap discrimination. The Board took action on both disciplinary matters at its March 23, 1990 meeting. In both cases, the Board ruled that all three causes of action were sustained, including the alleged violations of section 12(i) of the Rules and Regulations, which requires that Department members keep themselves in proper physical condition.

The Board's decisions, sustaining the eight- and fourteen-day suspensions, were challenged in a petition for peremptory writ of mandate filed in the Los Angeles County Superior Court on June 21, 1990. Following a hearing on February 14, 1991, the petition was denied. The statement of decision contains the following findings, which appellant challenges: that the Department's weight control program was "well within the scope of reasonableness"; that persuasive evidence established that appellant's obesity negatively affected her physical condition, and that because of her obesity, appellant was "not in proper physical condition to perform her job duties"; that appellant's conduct was "likely to cause harm to the public service"; and, that the penalties imposed "were proper in all respects, and . . . were reluctantly imposed after [appellant] had been given significant opportunities to deal with her severe and potentially dangerous overweight condition."

THE ISSUES[10]

I

We first consider the sufficiency of evidence to support the superior court's finding that, due to obesity, appellant was not in proper physical condition necessary to perform her job duties. Our determination of that issue will, to some extent, be dispositive of several other issues raised.

---

[10]In addition to pursuing her administrative remedies, appellant and three other disciplined paramedics, and their union, UPLA, filed a suit in federal court seeking to have the weight control program declared unconstitutional. The federal district court granted summary judgment in favor of the City. The Ninth Circuit Court of Appeals issued an unpublished memorandum decision affirming the district court's decision on June 25, 1991. The Ninth Circuit Court of Appeals found that the weight control program's intrusion upon the privacy interests of employees was, at most, minimal, and that the Department had sufficiently justified the minimal intrusion. Also rejected by the Ninth Circuit Court of Appeals were the plaintiffs' claims that enforcement of maximum allowable weight limitations violated employees' due process rights by subjecting them to discipline without an individualized determination of unfitness, and violated their equal protection rights by classifying EMS employees in a weight limitation program which bears no rational relationship to legitimate government interests. At respondents' request, we have taken judicial notice of the Ninth Circuit Court of Appeals' memorandum opinion solely to determine what issues were actually litigated and determined, and whether the federal action has any arguable res judicata effect. (Cal. Rules of Court, rule 977(b)(1).)

Preliminarily, we reject as unsupported any suggestion that the Department did not in fact rely on appellant's failure to maintain proper physical conditioning as a basis for imposing the contested eight- and fourteen-day suspensions. In both disciplinary matters, the Department charged appellant with a violation of section 12(i) of the Rules and Regulations, which imposes the requirement that members maintain physical fitness, and devoted substantial portions of its case before the hearing examiners to proving appellant's impaired physical conditioning.

The Department's evidence shows that as early as mid-1985, as appellant's weight approached 200 pounds, her performance evaluation reports began to reflect a need for improvement in the areas of physical fitness, agility and personal appearance, due to increasing obesity. In a 1986 performance evaluation report, appellant was specifically criticized for having lost some of the agility needed to perform some of her duties, with particular reference to "working in tight areas." By mid-1988, appellant's size reached sufficiently alarming proportions that fitness tests were administered to assess her cardiovascular health, and temporary exercise restrictions were imposed. Those tests confirmed that appellant's physical conditioning was "very poor," and that her obesity could be expected to negatively impact the speed and endurance with which she performed the duties of a paramedic.

The superior court reasonably concluded that appellant's subsequent weight gains up to 231 pounds did nothing to improve her poor endurance and agility as evidenced in professionally administered cardiac stress tests. Viewed according to the customary standard of review governing administrative mandamus proceedings (*Franz* v. *Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 135 [181 Cal.Rptr. 732, 642 P.2d 792]), substantial evidence thus supports the superior court's finding that appellant violated section 12(i) of the Rules and Regulations by failing to maintain the level of physical fitness necessary to properly perform her job.

## II

█ Appellant contends that the trial court's finding that the weight control program was "well within the scope of reasonableness" is not supported by the law or the evidence. Regarding this finding, it is asserted that because the Department never validated any particular weight or percentage of body fat to be job-related, the use of fixed weight standards is arbitrary as a matter of law, as well as inconsistent with section 12(i) of the Rules and Regulations, and contrary to the City's affirmative action policy and the State of California's antidiscrimination laws.

To begin with, appellant's use of the descriptive term "fixed weight standard" is misleading. There is nothing at all "fixed" about the weight

limitations imposed on the Department's EMS workers. Maximum allowable weights are individually tailored using data collected by trained medical personnel using scientifically accepted methods, and take into account the subject's gender, weight, age, height, body type and percentage of lean and fat body weights. Even after a maximum allowable weight is "fixed" in this manner, a dissatisfied employee may request reevaluation by the CRC, or may consult a private physician or weight control clinic. The employee may bring to the Department's attention additional medical evidence which will be considered in setting periodic and maximum weight goals. Indeed, appellant twice had her maximum allowable weight adjusted upward in this manner.

Nor is the Department's enforcement of medically established maximum allowable body weights arbitrary. Undisputed evidence in the administrative record establishes that the job of a paramedic is physically demanding. In life-threatening situations, paramedics are regularly called upon to climb stairs, lift and carry patients, gurneys and medical equipment for long distances, to perform physically demanding medical procedures, such as CPR, for extended periods of time, and to maneuver patients, equipment and themselves in cramped or obstructed areas such as automobiles, doorways and narrow hallways. Strength, endurance, agility and speed are essential to the safe and efficient performance of these tasks.

The Department offered uncontroverted testimony that paramedics as a group are prone to job-related injury, and that the Department's job-related injury rate declined for several years following its implementation of the physical fitness and weight control programs in the early 1970's. More recent data was not presented because increases in emergency call load and changes in the Department's civilian work force made ongoing analysis of the relationship between employee fitness levels and injury rates more difficult. Evidence of the well-established connection between obesity and increased risk of health problems such as heart disease, stroke, and high blood pressure was virtually unchallenged by appellant, as was evidence of the significant relationship of obesity to increased fatigue and reduced stamina, agility, speed and coordination. Uncontroverted expert testimony also established that obesity both increases a person's risk of musculo-skeletal injury and slows the rate of recovery from such injuries.[11] The enforcement of individually tailored, medically reasonable, maximum allowable body weight limits is a reasonable means of insuring the health and safety of the Department's EMS employees and the public.

[11]Medical records were presented showing that, between September 1980 and January 1989, appellant missed 97 days of work due to knee injuries and 24 days of work due to back injuries. No evidence was presented regarding the possible relationship of appellant's obesity to her injury and recovery rates.

■ Appellant nevertheless argues that the Department's enforcement of so-called "fixed" weight standards, not related to job performance, is unreasonable as a matter of law because the practice is contrary to section 12(i) of the Rules and Regulations, which requires only maintenance of that level of physical fitness which is "necessary" to perform the duties of a paramedic. The argument is somewhat academic in this case given ample proof that appellant's physical conditioning slipped below the threshold of necessity established by section 12(i).

In any event, the Manual of Operation, which comprises a part of appellant's employment agreement, specifies that proper weight control is a condition of employment. Section 12(i) of the Rules and Regulations must be read in the context of this condition and other rules and regulations governing mandatory participation of overweight paramedics in the Department's long-standing physical fitness and weight control programs. So read, enforcement of maximum allowable weight limitations violates neither the letter nor the spirit of section 12(i).

■ Citing the City's affirmative action policy[12] and California's antidiscrimination laws,[13] appellant also accuses the Department of handicap discrimination because she suffers from a thyroid condition which contributes to her obesity problem. A person is considered handicapped under California law if he or she suffers from a physiological disorder affecting the endocrine system, which includes the thyroid. (Cal. Code Regs., tit. 2, div. 4, § 7293.6, subd. (d).) This issue was directly raised in appellant's exceptions to the hearing examiners' reports and in the petition for peremptory writ of mandate although no statistical data establishing that the weight control program had a disparate impact on the handicapped was presented to the hearing examiners.

The weaknesses in appellant's claim of handicap discrimination are readily apparent. The challenged suspensions were imposed because appellant repeatedly failed to achieve her periodic weight loss goal of two pounds

---

[12]The Supervisor's Guide to Affirmative Action (City of Los Angeles Personnel Department Equal Employment, May 1983) in the City of Los Angeles is a part of the administrative record. Appellant quotes passages of the guide which declare a policy requiring that all City personnel actions be based on uniformly applied criteria of relative fitness to perform the duties of the position sought or held, and not on considerations of race, color, religion, national origin, sex, age, handicap, marital status, or sexual preference. Also quoted are the several sections of the guide which require elimination of all job requirements which are not job related, and validation of preemployment tests to guarantee a link between the skills and abilities needed for a job, and the skills and abilities actually measured by preemployment tests.

[13]Here, appellant relies on Government Code section 12940, which declares it an unlawful employment practice, "unless based upon a bona fide occupational qualification," to discharge or otherwise discriminate against a person because of a physical handicap or medical condition.

per month as required by the Department's weight control program *and* because she compromised her ability to perform the duties of her job by failing to keep herself in proper cardiovascular condition. Although appellant's thyroid disorder was, without question, a significant factor contributing to her obesity, there is no evidence to suggest that the condition rendered her physically incapable of complying with the Department's weight and body fat standards, or that such compliance would have jeopardized her health. Indeed, appellant lost two or more pounds per month on dozens of occasions between 1983 and 1989, and on one occasion in 1987, maintained her maximum allowable weight of 150 pounds for several months. Furthermore, a letter from a private physician, dated March 31, 1988, expresses the doctor's expectation that as appellant's thyroid medication is stabilized, he "[looks] forward to a reduction in [appellant's] weight."[14]

Assuming arguendo that appellant's obesity and unfitness were the result of a thyroid disorder, even a colorable claim of handicap discrimination is defeated by showing that the Department's percentage of body-fat-based weight standards are "based upon a bona fide occupational qualification." (Gov. Code, § 12940.)[15] Here, the need for medically reasonable body fat and weight limitations for paramedics was supported not by stereotyped generalizations, but by statistical studies establishing that obesity decreases the strength, agility, endurance, and speed of EMS workers and increases the risks of job-related injury, heart disease, stroke, and high blood pressure. (Cf. *Hardy* v. *Stumpf* (1974) 37 Cal.App.3d 958, 965 [112 Cal.Rptr. 739].)

Furthermore, there can be no dispute that appellant was significantly obese by currently accepted medical standards. Appellant's observable loss of agility and clinically measured loss of endurance resulting from her excess body fat sufficiently established that appellant was incapable of performing her job in a manner that would not endanger her own health or safety, or the health and safety of others. (Cf. *American National Ins. Co.* v. *Fair Employment & Housing Com.* (1982) 32 Cal.3d 603, 610 [186 Cal.Rptr. 345, 651 P.2d 1151].) Greater imminency of disaster is not required to meet standards of reasonableness.

---

[14] The letter, directed to "To Whom It May Concern," advises the reader that appellant is taking medication for "euthyroid sick syndrome and a consideration of hypometabolism," conditions which contribute to her obesity. It further predicts an eventual reduction in appellant's weight as her medication is stabilized, but refrains from predicting the rate at which appellant will lose weight due to appellant's "physical resistance to weight loss without major calorie deprivation." The copy of the letter in the administrative record is unsigned. The Department denied ever receiving the letter, and its several midhearing requests for a signed copy were ignored.

[15] Government Code section 12940.1 even establishes a rebuttable presumption that individuals with "heart trouble," as referred to in Labor Code section 3212, cannot perform the duties of a firefighter or law enforcement officer in a manner which would not endanger the health and safety of the individual and others.

## III

Appellant also challenges as unsupported in law or fact the trial court's finding that the penalties imposed "were proper in all respects." This argument, too, has several components.

■ It is argued that suspension was unnecessary because other procedures were available to ensure the health and safety of EMS employees and the public. To wit, the City's civil service rules allow the Department to have medically examined, and to reassign or rehabilitate any employee suffering from a medical condition which impairs his or her effectiveness or endangers the employee or the public. (City of Los Angeles Civil Service Rules, §§ 13.9, 13.10.) In short, appellant seeks judicial intervention in favor of UPLA's heretofore unsuccessful proposal to modify its MOU so as to supplant the use of disciplinary measures to enforce maximum allowable body weight limitations with a program providing paid medical or disability leave for physically unfit EMS workers. Appellant and her union are currently bound by the 1983 letter of agreement in which UPLA's bargaining representative agreed to compulsory enrollment of union members in the Department's "necessary and beneficial" weight control program, absent some showing that the agreement abrogated employees' fundamental constitutional rights. (Gov. Code, § 3500 et seq.; *Phillips* v. *State Personnel Bd.* (1986) 184 Cal.App.3d 651, 659-660 [229 Cal.Rptr. 502] disapproved on unrelated grounds in *Coleman* v. *Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1113 [278 Cal.Rptr. 346, 805 P.2d 300]; *Andrews* v. *Board of Supervisors* (1982) 134 Cal.App.3d 274, 279-280 [184 Cal.Rptr. 542].)

■ Appellant contends that obesity is not among the acts listed as punishable misconduct in the City's guide to disciplinary standards. The guide does impose upon civil service employees the duty to "provide a high quality of service to the public . . . and consistently perform their duties effectively and efficiently," and it is an enumerated offense to commit a "violation of department rules." (City of Los Angeles Civil Service Rules, § 33.2.) There is no shortage of evidence that appellant failed to comply with departmental rules governing physical fitness and weight loss *and* that the violation of those rules impacted the quality and efficiency of appellant's service to the public.

■ Finally, appellant contends, the eight- and fourteen-day suspensions were excessive because there was no showing that appellant's conduct resulted in "harm to the public service" as required by *Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194, 218 [124 Cal.Rptr. 14, 539 P.2d 774].)

The argument is redundant of appellant's other contentions relating to the sufficiency of evidence to support the trial court's findings, and is equally lacking in merit.

Under *Skelly* v. *State Personnel Bd.*, *supra*, 15 Cal.3d 194, the penalties imposed by an administrative body are not excessive if the employee's conduct, *if repeated*, is likely to result in harm to the public service. (*Id.* at p. 218.) In the context of the Department's weight control program, appellant is a recidivist who is, without question, likely to offend again. The public and private risks which result from appellant's obesity and substandard cardiovascular condition have been adequately addressed elsewhere in this opinion. It suffices to say that the challenged suspensions did not breach the *Skelly* standard.

The judgment is affirmed. Appellant's request for an award of attorney fees is denied.

Gates, Acting P. J., and Manella, J.,* concurred.

---

*Judge of the Municipal Court for the Los Angeles Judicial District sitting under assignment by the Chairperson of the Judicial Council.