**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
                              *Plaintiff,*

          and

SHAWN HOGYA, JAMES FRANCIS,
JAMES AKINS, and CHRIS WILSON,
              *Intervenors-Appellants,*

          v.

UNITED PARCEL SERVICE, INC.,
              *Defendant-Appellee.*

No. 03-16855

D.C. No.
CV-97-00961-WHA

LARRY BRYAN and IGNACIO TORRES,
              *Plaintiffs-Appellants,*

          and

TIM HANCOCK, JEFF MORALES, CREG
QUIROZ, and MARK JENSEN,
                              *Plaintiffs,*

          v.

UNITED PARCEL SERVICE, INC.,
              *Defendant-Appellee.*

No. 04-15928

D.C. No.
CV-01-01730-WHA

13269

LARRY BRYAN, TIM HANCOCK, JEFF
MORALES, IGNACIO TORRES, CREG
QUIROZ, and MARK JENSEN,
        *Plaintiffs-Appellees,*

        v.

UNITED PARCEL SERVICE, INC.,
        *Defendant-Appellant.*

No. 04-16403
D.C. No.
CV-01-01730-WHA

OPINION

Appeals from the United States District Court
for the Northern District of California
William H. Alsup, District Judge, Presiding

Argued and Submitted May 10, 2005
(Nos. 03-16855, 04-16403)
Submitted May 10, 2005
(No. 04-15928)*
San Francisco, California

Filed September 15, 2005

Before: Andrew J. Kleinfeld, Michael Daly Hawkins, and
Susan P. Graber, Circuit Judges.

Opinion by Judge Graber

---

*This panel unanimously finds this case suitable for decision without
oral argument. Fed. R. App. P. 34(a)(2).

**COUNSEL**

Andrea G. Asaro, Rosen, Bien & Asaro, LLP, San Francisco, California, for intervenors-appellants and plaintiffs-appellees; John J. Mavredakis, Law Offices of John J. Mavredakis, Santa Rosa, California, for the plaintiffs-appellants.

Mark A. Perry, Gibson, Dunn & Crutcher LLP, Washington, D.C., and Kathrin Sears and Rachel Brass, Gibson, Dunn & Crutcher LLP, San Francisco, California, for the defendant-appellee/appellant.

Claudia Center and Elizabeth Kristen, The Legal Aid Society Employment Law Center, San Francisco, California, for the amici curiae.

**OPINION**

GRABER, Circuit Judge:

Defendant United Parcel Service, Inc. ("UPS"), denied driving positions to certain employees because the employees failed to pass UPS's "Vision Protocol," which requires drivers to have some central vision and some peripheral vision in each eye. In two separate actions, the employees alleged that UPS had discriminated against them because of their monocular vision, a disability, in violation of California's Fair Employment and Housing Act ("FEHA").

We hold that the employees are sufficiently limited in the major life activities of seeing and working to fall within FEHA's broad definition of disability. We therefore affirm, on interlocutory appeal, the district court's partial summary judgment on the issue of disability in favor of the employees in one action. But, for the other group of employees, who appeal from the district court's final judgment after a bench trial, the threshold disability determination is not dispositive. Although those employees likewise are disabled within the meaning of FEHA, we affirm the judgment in favor of UPS because UPS has demonstrated that the employees would "endanger the health or safety of others to a greater extent than if an individual without a disability performed the job" and, thus, has satisfied FEHA's safety-of-others defense. *See* Cal. Code Regs., tit. 2, § 7293.8(d).

## FACTUAL AND PROCEDURAL HISTORY

### *Factual background*[1]

Monocular vision generally results in a decrease in peripheral vision: An average monocular individual has a field of view that is 10 to 40 degrees less than the field of view of an average binocular individual. *EEOC v. United Parcel Servs., Inc.*, 149 F. Supp. 2d 1115, 1142 (N.D. Cal. 2000) ("*EEOC*"), *rev'd in part*, 306 F.3d 794, 797 (9th Cir. 2002); *see also id.* ("Normal binocular vision spans a field of view of 160 to 180 degrees, whereas normal monocular vision spans 140 to 150 degrees."). Central vision acuity, on the other hand, is not affected by lack of vision in one eye—a monocular individual with 20/20 vision in one eye can see as well looking straight ahead as a binocular individual with 20/20 vision. *See id.* at 1141-42.

---

[1]Our brief discussion draws heavily from the district court's findings of fact in *EEOC v. United Parcel Servs., Inc.*, 149 F. Supp. 2d 1115, 1122-56 (N.D. Cal. 2000) ("*EEOC*"), *rev'd in part*, 306 F.3d 794, 797 (9th Cir. 2002). More factual detail can be found there.

Other than decreased peripheral vision, the primary difficulty that monocular individuals experience is with near-field depth perception. "Individuals who can see out of only one eye are unable to perform stereopsis, the process of combining two retinal images into one through which two-eyed individuals gain much of their depth perception, particularly at short distances." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 n.12 (1999). The inability to perform stereopsis can affect a range of near-field activities, including working with tools. *See, e.g.*, *EEOC*, 149 F. Supp. 2d at 1146, 1151, 1153. On the other hand, monocularity usually does not impair depth perception at a distance. "In their distance vision, monocular individuals are able to compensate for their lack of stereopsis to varying degrees by relying on monocular cues, such as motion parallax, linear perspective, overlay of contours, and distribution of highlights and shadows." *Kirkingburg*, 527 U.S. at 566 n.12.

Before 1988, the federal Department of Transportation ("DOT") regulated all commercial vehicles regardless of weight, and DOT regulations barred monocular individuals from driving even small commercial vehicles. *EEOC*, 149 F. Supp. 2d at 1130. By July 1995, however, DOT had changed its rules to exempt lightweight commercial vehicles from federal regulation. *Id.* Thus, under the existing DOT rules, monocular individuals are permitted to drive commercial vehicles weighing 10,000 pounds or less. *See* 49 C.F.R. § 350.105.[2]

Defendant UPS employs about 70,000 people to drive package cars that pick up and deliver packages along established routes. *EEOC*, 149 F. Supp. 2d at 1122. Most employees of UPS must start in part-time, entry-level loading positions and accumulate seniority in order to bid to become

---

[2]At one time, DOT also had an experimental certification-waiver program for monocular drivers, under which 11 UPS monocular drivers drove large, DOT-regulated UPS trucks without incident. *EEOC*, 149 F. Supp. 2d at 1132.

part-time, then full-time, package car drivers. *Id.* at 1123-24. The vast majority of UPS package cars weigh more than 10,000 pounds and, therefore, are subject to DOT regulations. *Id.* at 1124. Specifically, the district court found that only 5,511 of UPS's 67,178 package cars weigh 10,000 pounds or less. *Id.* Some established routes are served by those lighter vehicles. *Id.* at 1125. The monocular employees involved in these cases seek to drive *only* the lighter package cars for which DOT certification is not required.

UPS generally requires all driver applicants to pass DOT's vision standards, because they will be asked to drive routes served by both heavy (DOT-regulated) and light (non-regulated) package cars. *See id.* at 1128. Beginning in 1995, however, UPS made an accommodation that would allow vision-impaired applicants to drive nonregulated cars if they passed a "Vision Protocol." The Vision Protocol is *less* rigorous than the vision standards that DOT requires drivers of the regulated cars to satisfy. *Id.* at 1133. DOT's standards for regulated vehicles require visual acuity of 20/40 and peripheral vision of 70 degrees in *each* eye. *Id.* at 1129-30, 1133. The Vision Protocol, as relevant here, requires:

- 20/40 (corrected or uncorrected) in the *better* eye;

- 20/200 (corrected or uncorrected) in the affected eye;

- peripheral vision of 70 degrees in each eye *or* a combined horizontal visual field of 140 degrees; and

- peripheral acuity of at least 20/200 in each eye.

UPS's application of the Vision Protocol to deny driving positions to monocular employees prompted the actions leading to the three appeals that are now before us. We turn now to the procedural history of those three appeals.

*Procedural History*

*No. 03-16855: Intervenors Hogya, Francis, Akins, and Wilson*

In March 1997, the Equal Employment Opportunity Commission ("EEOC") filed an action against UPS on behalf of more than 100 monocular driver applicants, alleging discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA"). Shawn Hogya, James Francis, James Akins, and Chris Wilson ("Intervenors") intervened in that action, asserting claims under both the ADA *and* FEHA. The district court held a bench trial involving four "pilot claimants"—Hogya, Francis, and two EEOC plaintiffs.

At the conclusion of that trial, the district court entered a final judgment and issued a lengthy published opinion that includes numerous findings of fact. The court's principal legal conclusions were (1) that all the plaintiffs and Intervenors were either disabled or "regarded as" disabled under the ADA, *EEOC*, 149 F. Supp. 2d at 1156-58; (2) that Hogya (but not Francis) had proved that he was qualified to perform the job's essential function of safe driving, *id.* at 1158-59; and (3) that UPS had not satisfied the ADA defense by proving that its Vision Protocol was "job-related and consistent with business necessity," under 42 U.S.C. § 12113(a), *id.* at 1159-71. The court did not address Intervenors' FEHA claims separately, stating only that the "resolution of all FEHA claims will be deemed to follow the resolution of all ADA claims." *Id.* at 1159.

On appeal, we reversed the district court's threshold disability determinations under the ADA. *EEOC v. United Parcel Serv., Inc.*, 306 F.3d 794, 797 (9th Cir. 2002). We held (1) that the pilot claimants were not disabled, because their monocularity did not keep them "from using [their] eyesight as most people do for daily life," *id.* at 803; and (2) that, in order to establish that they were "regarded as" disabled, the

employees must prove that UPS perceived them as limited in their activities of daily life, not merely in their employment (as the district court had held), *id.* at 806. Rather than decide whether UPS regarded monocular employees as disabled with respect to their daily activities, we acknowledged the district court's greater familiarity with the evidence and remanded for the district court to consider that issue in the first instance. *Id.*

"Because the existence of a 'disability' is a gateway requirement for the ADA," we did not comment on the other issues raised in the appeal and cross-appeals—most significantly, on UPS's defenses to liability. *See id.* at 797. We did note that, if the district court were to hold on remand that no claimant was regarded as disabled under the ADA, the court would have to decide whether the employees were disabled under FEHA. *Id.* at 806. We retained jurisdiction over any future appeals and stated that "briefing submitted on other issues in the present appeal and cross-appeals will be deemed submitted in any such future appeal as well." *Id.* at 806 n.6.

As we anticipated, on remand the district court held that none of the employees was regarded as disabled under the ADA and proceeded to address Intervenors' claims under FEHA. The court held, on the basis of the trial record, that Hogya is neither disabled nor regarded as disabled under FEHA and that Francis was not qualified to perform the job of package car driver. The claims of Intervenors Akins and Wilson had not been adjudicated in the court's earlier bench trial, but the court determined on summary judgment that they are neither disabled nor regarded as disabled under FEHA. In evaluating Intervenors' disability claims, the district court considered only limitations affecting the major life activity of *seeing*, because it held that, during the bench trial, Intervenors had waived their arguments as to the major life activity of *working*.[3]

---

[3] Akins and Wilson dispute that a waiver applied to them, because they were not among the pilot claimants in the bench trial. Because we conclude that all Intervenors are limited in the major life activity of seeing, and therefore are disabled under FEHA, we need not address the waiver issue.

Intervenors appeal the district court's final judgment and, in response, UPS argues that the district court correctly concluded that Intervenors are not disabled under FEHA. In the alternative, UPS asks us to affirm the judgment in its favor because the Vision Protocol can be justified under FEHA's business necessity or safety-of-others defense.

*No. 04-16403: Plaintiffs Hancock, Jensen, Morales, and Quiroz*

In May 2001, five Plaintiffs (Larry Bryan, Tim Hancock, Jeff Morales, Creg Quiroz, and Ignacio Torres) filed an action alleging disability discrimination under FEHA *only*; a later, similar action by a sixth Plaintiff, Mark Jensen, was consolidated with the *Bryan* action in the district court.

The *Bryan/Jensen* Plaintiffs filed a motion for partial summary judgment on the issue of disability, arguing that they are limited in the major life activity of working or, alternatively, that they are regarded as such. The district court granted the motion, holding that Plaintiffs' exclusion from the single job of full-time package car driver at UPS demonstrated a limitation in working under FEHA. The district court certified the following question to us for interlocutory appeal: "whether this record shows that plaintiffs are disabled in the major life activity of 'working' within the meaning of FEHA and Section 12926.1 thereof." The court noted that "both sides have stipulated that this issue can be decided on this summary-judgment record without the necessity of a trial." Under 28 U.S.C. § 1292(b), we granted UPS permission to appeal the district court's partial summary judgment.

*No. 04-15928: Plaintiffs Bryan and Torres*

Plaintiffs Larry Bryan and Ignacio Torres voluntarily dismissed their claims because they had not exhausted their administrative remedies. The district court ordered Plaintiffs' counsel to pay attorney fees to Defendant because of coun-

sel's delay in dismissing the claims. Plaintiffs and their counsel appeal the award of attorney fees.

To summarize:

In the *Hogya* action, No. 03-16855, the district court held that Intervenors Shawn Hogya, James Akins, and Chris Wilson are neither disabled nor regarded as disabled with respect to the major life activity of seeing. Because of two driving accidents, the court held that Intervenor James Francis was not qualified for the position. Intervenors appeal from a final judgment, and we have jurisdiction under 28 U.S.C. § 1291.

In the *Bryan* action, No. 04-16403, the district court held that Plaintiffs Tim Hancock, Mark Jensen, Jeff Morales, and Creg Quiroz are disabled with respect to the major life activity of working. Defendant appeals interlocutorily from a partial summary judgment, and we have jurisdiction under 28 U.S.C. § 1292(b).

Also in the *Bryan* action, No. 04-15928, the district court ordered Plaintiffs' counsel to pay attorney fees to Defendant because of counsel's delay in dismissing the claims of Plaintiffs Bryan and Torres. Plaintiffs and their counsel appeal the award of attorney fees, No. 04-15928, and we have jurisdiction under the collateral order exception of 28 U.S.C. § 1291. *Riverhead Sav. Bank v. Nat'l Mortgage Equity Corp.*, 893 F.2d 1109, 1113 (9th Cir. 1990).

## STANDARDS OF REVIEW

Plaintiffs Hogya and Francis appeal from judgment following a bench trial. A district court's interpretation of state law is reviewed de novo. *Goldman v. Standard Ins. Co.*, 341 F.3d 1023, 1026 (9th Cir. 2003). Mixed questions of law and fact generally are reviewed de novo. *Star v. West*, 237 F.3d 1036, 1038 (9th Cir. 2001). If, however, the application of the law to the facts requires an inquiry that is essentially factual,

review is for clear error. *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002). Issues of fact are reviewed for clear error. *Id.*

By contrast, Plaintiffs Akins and Wilson in the *Hogya* action, and Defendant in the *Bryan* action, appeal from orders granting summary judgment and partial summary judgment, respectively. We review de novo a grant of summary judgment. *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1064 (9th Cir. 2002) (en banc). We must view the evidence in the light most favorable to the nonmoving party and decide whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* When a mixed question of fact and law involves undisputed underlying facts, summary judgment may be appropriate. *Colacurcio v. City of Kent*, 163 F.3d 545, 549 (9th Cir. 1998).

An award of attorney fees under California Government Code § 12965 is reviewed for abuse of discretion. *Bond v. Pulsar Video Prods.*, 57 Cal. Rptr. 2d 917, 918 (Ct. App. 1996).

## DISCUSSION

The principal questions that we will address in this opinion, all pertaining to FEHA only, are: (1) whether Intervenors are disabled with respect to the major life activity of seeing; (2) whether Plaintiffs are disabled with respect to the major life activity of working; (3) whether UPS can avoid liability because of an affirmative defense; and (4) whether the district court abused its discretion by awarding attorney fees to UPS. We conclude that Intervenors and Plaintiffs have established a disability under FEHA,[4] but that UPS can avoid liability in

---

[4]Because we conclude that Intervenors and Plaintiffs satisfy FEHA's primary definition of "physical disability," Cal. Gov't Code § 12926(k)(1), we need not and do not address their alternative argument that UPS "regard[s] or treat[s]" them as having a physical disability under § 12926(k)(4).

the *Hogya* action under FEHA's safety-of-others defense. Finally, we conclude that the district court made an error of law, and therefore abused its discretion, in awarding attorney fees.

I.  *Intervenors' and Plaintiffs' monocularity is a "physical disability" under FEHA.*

**[1]** The threshold question in a FEHA action is whether the plaintiff's qualifying medical condition "[l]imits a major life activity."[5] Cal. Gov't Code § 12926(k)(1)(B). By contrast to the ADA, which requires that the plaintiff's condition "*substantially* limit[ ]" a major life activity, 42 U.S.C. § 12102(2)(A) (emphasis added), and which has been interpreted to have a restricted scope of coverage, *see, e.g.*, *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 487 (1999) (noting that Congress intended to limit the number of people who would qualify as "disabled" under the ADA), the California statute expressly "contains broad definitions of physical disability," Cal. Gov't Code § 12926.1(b).

**[2]** The current version of FEHA spells out, in some detail, how courts are to assess limitations on a major life activity:

> For purposes of this section:
>
> (i) "Limits" shall be determined without regard to mitigating measures such as medications, assistive devices, prosthetics, or reasonable accommodations, unless the mitigating measure itself limits a major life activity.

---

[5]In this case, there is no dispute that monocularity qualifies as a "physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss" that affects one of the "body systems" listed in the first prong of FEHA's definition of "physical disability," Cal. Gov't Code § 12926(k)(1)(A).

(ii) A physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss limits a major life activity if it makes the achievement of the major life activity difficult.

(iii) "Major life activities" shall be broadly construed and includes physical, mental, and social activities and working.

*Id.* § 12926(k)(1)(B). If those instructions did not adequately differentiate FEHA's definition of "disability" from the ADA's, the statute provides even further guidance in the following findings and declarations:

(a) The law of this state in the area of disabilities provides protections independent from those in the federal [ADA]. Although the federal act provides a floor of protection, this state's law has always, even prior to passage of the federal act, afforded *additional* protections.

(b) The law of this state contains broad definitions of physical disability, mental disability, and medical condition. It is the intent of the Legislature that the definition[ ] of physical disability . . . be construed so that applicants and employees are protected from discrimination due to an actual or perceived physical . . . impairment that is disabling . . . or . . . *potentially* disabling.

(c) . . . [T]he Legislature has determined that the definition[ ] of "physical disability" . . . under the law of this state require[s] a "limitation" upon a major life activity, but *do[es] not require, as does the [ADA], a "substantial limitation." This distinction is intended to result in broader coverage under the law of this state than under that federal act.* Under the law of this state, whether a condition lim-

its a major life activity shall be determined without respect to any mitigating measures, unless the mitigating measure itself limits a major life activity, regardless of federal law under the [ADA]. Further, under the law of this state, "working" is a major life activity, regardless of whether the actual or perceived working limitation implicates a particular employment or a class or broad range of employments.

*Id.* § 12926.1(a)-(c) (emphasis added).

The California legislature enacted the quoted text in the Poppink Act of 2000. Although the Poppink Act's amendments to FEHA were not expressly made retroactive, the California Supreme Court ruled in *Colmenares v. Braemar Country Club, Inc.*, 63 P.3d 220, 224 (Cal. 2003), that the Poppink Act was "intended . . . *to clarify* the degree of limitation required for physical disability under the FEHA." (Emphasis added.); *see also id.* at 226 ("Thus, before and after passage of the Poppink Act the FEHA's test was 'limits,' not substantial limits.").

Textual differences between the current FEHA statute and the statute that was in effect when Intervenors filed their action do not change our analysis. As noted, the Poppink Act has been interpreted by California's highest court as an effort simply to clarify the "true meaning" of FEHA's limits test. *Id.*; *see also Goldman*, 341 F.3d at 1032-33 (" '[W]here a statute is unclear, a subsequent expression of the Legislature bearing upon the intent of the prior statute may be properly considered in determining the effect and meaning of the prior statute.' " (quoting *Tyler v. State*, 185 Cal. Rptr. 49, 51-52 (Ct. App. 1982))). In particular, we perceive no meaningful difference between the "limits" test described in *Colmenares* and the alternative "unusually difficult" standard that previously was incorporated into the FEHA statute and that was emphasized by the district court in this case. *See Am. Nat'l*

*Ins. Co. v. Fair Employment & Hous. Comm'n*, 651 P.2d 1151, 1155 (Cal. 1982) (defining "physical handicap" to mean "a condition of the body" that has the "disabling effect" of making " 'achievement unusually difficult' ").

In view of the legislature's express intent to provide broad coverage, we conclude that Intervenors are limited in the major life activity of seeing and that Plaintiffs are limited in the major life activity of working.

   A.   *Intervenors are limited in the major life activity of seeing.*

Intervenors have explained that their monocularity—and, in particular, their inability to perform stereopsis—makes a variety of close-range activities difficult for them. Akins and Wilson stated, in affidavits submitted in response to UPS's motion for summary judgment, that they are "unable" to perform or "have great difficulty" performing near-field tasks, including "inserting small objects into small holes or slots, screwing small objects into or onto another, tying knots, catching small objects, pouring liquid from one container to another, striking small objects and manipulating small tools or objects," without using their sense of touch and feel to substitute for their lack of depth perception. Hogya testified that, although he has trained himself to do most of the things that are important to his everyday life, he still "does not do things as fast as other people or as well" and that "there's always something new that comes up to me that is different for me, and it does place a difficulty on me." *EEOC*, 149 F. Supp. 2d at 1151; *see also id.* at 1146 (describing Francis' difficulties with certain near-field tasks, including handling tools). Nonetheless, the district court concluded that Intervenors are not disabled under FEHA because seeing was not "unusually difficult" for them when compared with the general population

—and, in particular, with farsighted individuals who also have difficulty seeing at close range.[6]

We agree with Intervenors that the district court's conclusion was incorrect as a matter of law. Judging depths at near distances is a significant aspect of the major life activity of seeing. As the affidavits and testimony demonstrate, near-field depth perception is important to a number of activities that sight normally is used to perform. "[T]he FEHA does not require that the disability result in utter inability or even substantial limitation on the individual's ability to perform major life activities. A limitation is sufficient." *DFEH v. Cal. Dep't of Corr.*, Dec. No. 03-11, 2003 WL 22733898, at *8 (Cal. F.E.H.C. 2003). Indeed, in its recent decision in *Colmenares*, the California Supreme Court expressly disapproved an appellate court's holding that the employee could not prove his case because he offered evidence of "only minor limitations." 63 P.3d at 226 n.6 (disapproving *Hobson v. Raychem Corp.*, 86 Cal. Rptr. 2d 497, 507 (Ct. App. 1999)).

Indeed, the California Fair Employment and Housing Commission ("FEHC") has held specifically that a monocular individual was disabled under FEHA. *See DFEH v. City of Merced Police Dep't*, Dec. No. 88-20, 1988 WL 242649, at *4 (Cal. F.E.H.C. 1988) (concluding that a monocular indi-

---

[6]In addition, the district court made some ambiguous references to Intervenors' adaptations to their monocularity. We agree with UPS that the district court assessed Akins' and Wilson's limitations without considering the "touch-and-feel" techniques that they use to substitute for their lack of depth perception. Therefore, we need not and do not decide whether it would have been error for the district court to have considered them as "mitigating measures," *see* Cal. Gov't Code § 12926(k)(1)(B)(i).

It is less clear whether the district court considered Hogya's adaptations in its FEHA decision and whether Hogya's purely *visual* adaptations, *see EEOC*, 149 F. Supp. 2d at 1156-57, are mitigating measures. Because Hogya established a disability by testifying that he does close-range tasks more slowly and not as well as others, and that he has difficulty when facing a task that is new to him, we need not and do not address those issues.

vidual was disabled under FEHA). Intervenors' limitations are materially indistinguishable from the limitations experienced by the monocular individual in *City of Merced*.

**[3]** In deciding whether Intervenors' limitations, similarly, make them "disabled" under FEHA, the proper comparative baseline is either the individual without the impairment in question or the average *unimpaired* person. For example, several FEHC decisions rely on medical evidence that demonstrates a limitation relative to the individual's own unimpaired state. *See, e.g.*, *Cal. Dep't of Corr.*, 2003 WL 22733898, at *8 (noting, among other things, a "25 percent reduction of [the complainant's] former capacity to lift"); *DFEH v. Albertson's, Inc.*, Dec. No. 03-05, 2003 WL 1244475, at *12 (Cal. F.E.H.C. 2003) (noting, among other things, that the complainant had "lost approximately 50% of her preinjury capacity" for manual tasks). In citing that evidence, neither decision asked whether the claimant's preinjury capacity was "average" or "above average." But implicit comparisons with the normal or average population also appear in the Commission's decisions. In citing evidence that the complainants had difficulty with tasks such as dressing and sleeping, the FEHC implicitly presumes that most people can perform those tasks without difficulty. *See, e.g.*, *Cal. Dep't of Corr.*, 2003 WL 22733898, at *8. And, in at least one decision, the FEHC made explicit this inherent comparison with a "normal" or "average" baseline. In *DFEH v. Jefferson Smurfit Corp.*, Dec. No. 98-01, 1997 WL 840033, at *5 (Cal. F.E.H.C. 1997), a limitation to a 40-hour work week was held not to limit a major life activity because 40 hours is "considered a full work week in our culture."

By contrast, we have found no FEHC decisions that assess whether the complainant's limitations were worse than those of *other impaired people*. For instance, the FEHC noted that a complainant's bursitis and muscle strain "interrupted her ability to sleep." *Cal. Dep't of Corr.*, 2003 WL 22733898, at *8. But the FEHC did not contemplate that the complainant's

limitation would be minimized by the fact that many otherwise nondisabled people also suffer from conditions, such as jet lag or age-related insomnia, that interrupt their ability to sleep.

[4] In short, under FEHA and its relevant interpretations, the district court erred by holding that Intervenors are not limited in the major life activity of seeing simply because other people with common vision impairments are also limited.[7] Intervenors demonstrated that seeing, and a variety of tasks for which seeing is commonly used, are made difficult for them because of their monocularity and consequent inability to perform stereopsis. FEHA requires no more.

B. *Plaintiffs are limited in the major life activity of working.*

[5] The *Bryan* Plaintiffs contend that their monocularity limits them in working. In the Poppink Act, the California legislature expressly recognized "working" as a major life activity, § 12926(k)(1)(B)(iii), and added that this is so "regardless of whether the actual or perceived working limitation implicates a particular employment or a class or broad range of employments," *id.* § 12926.1(c). The district court concluded that, by enacting § 12926.1, the California legislature sought to disapprove *Sutton*, 527 U.S. at 491-93, which the district court characterized as holding that "the exclusion from a single job with a single employer does not constitute a substantial limitation in 'working' under the ADA." Relying on § 12926.1, the district court held that Plaintiffs' "exclusion from the single position of full-time UPS package-car driver,

---

[7]Additionally, as Intervenors point out, someone with severe myopia, viewed in its uncorrected state, likely also would be disabled under FEHA. *See*, *e.g.*, *DFEH v. S. Pac. Transp.*, Dec. No. 81-09, 1981 WL 30852, at *4 (Cal. F.E.H.C. 1981) (treating myopia as a handicap); *DFEH v. Orange County Sheriff-Coroner Dep't*, Dec. No. 82-26, 1982 WL 36770, *6 (Cal. F.E.H.C. 1983) (treating a person with 20/200 vision as handicapped).

notwithstanding their ability to perform other jobs (both within and outside of UPS), constitutes a limitation" in working.

The terms "class of jobs" and "broad range of jobs" have commonly understood meanings in federal employment law. "To be substantially limited in the major life activity of working," ADA plaintiffs must show that they are precluded from a "substantial class of jobs" or a "broad range of jobs." *Sutton*, 527 U.S. at 492. Federal regulations define the term "class of jobs" as "jobs utilizing . . . training, knowledge, skills or abilities" similar to the job from which the plaintiff is disqualified. 29 C.F.R. § 1630.2(j)(3)(B). So, for example, in *Sutton*, the relevant "class of jobs" was pilot positions that utilized the plaintiff's skills, and not the "single job" of "global airline pilot." 527 U.S. at 493. In *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 524 (1999), the relevant "class of jobs" was mechanic positions, and not the narrower category of mechanic positions that require driving a commercial motor vehicle.

The district court correctly ruled that the California legislature acted against this federal backdrop. In fact, the context of the legislature's statement about working in § 12926.1(c) demonstrates that the statement was regarded as an example of the ways in which the distinction between "limitation" and "substantial limitation" makes FEHA different from the ADA. In other words, FEHA's definition of disability is broader because, among other things, it encompasses a limitation in a "particular employment," which must be something less than a "class of jobs" or a "broad range of jobs."

UPS attempts to defeat this close parallel by arguing that the word "employment" means "occupation" and not "job," and therefore the legislature was not responding to *Sutton*'s "single job" holding. In fact, "employment" can be used both in the sense of a general occupation and in the sense of a particular job. *See* Webster's Third New Int'l Dictionary 743

(unabridged ed. 1993) (defining "employment" as an "activity in which one engages and employs his time and energies: as . . . work (as customary trade, craft, service, or vocation)" *OR* as "an instance of such activity"). Thus, dictionary definitions are less helpful than the background federal law in determining the legislature's intent.

[6] Even if the district court interpreted "particular employment" too narrowly, however, we still would have to affirm its partial summary judgment for Plaintiffs with respect to working. Plaintiffs demonstrated that they are limited in working as commercial delivery drivers, not only because they are excluded from working as full-time package car drivers for UPS, but also because they are excluded from any commercial driving position that requires DOT[8] or state[9] certification. Thus, even if "particular employment" is interpreted more broadly than "single position with a single employer," Plaintiffs' monocularity limits their ability to work in the occupation of commercial delivery driver.

The fact that Plaintiffs are eligible for other commercial driving positions, such as those that require only a Class C driver's license in California, Cal. Veh. Code § 12804.9, does

---

[8]DOT requires certification of drivers of all "[c]ommercial motor vehicle[s]," defined as

motor vehicle[s] that ha[ve] any of the following characteristics:

(1) [Weighs 10,001 pounds or more].

(2) Regardless of weight, is designed or used to transport 16 or more passengers, including driver.

(3) Regardless of weight, is used in the transportation of hazardous materials and is required to be placarded pursuant to 49 CFR part 172, subpart F.

49 C.F.R. § 350.105.

[9]California requires DOT certification for ambulance drivers, Cal. Veh. Code § 12527, and for Class A or B driver's licenses, which are necessary to drive a number of other vehicles, *id.* § 12804.9.

not mean that they have not demonstrated a sufficient limitation to satisfy FEHA.[10] Within the realm of commercial driving positions, the regulations certainly make working more difficult than it would be for the average, unimpaired person with similar training, skills, and abilities. *Cf.* 29 C.F.R. § 1630.2(j)(3)(i) (defining "substantially limit[ed]" in working as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes *as compared to the average person having comparable training, skills and abilities*" (emphasis added)).

**[7]** In sum, we affirm the district court's partial summary judgment in the *Bryan* action because Plaintiffs are limited in working as commercial delivery drivers.[11] Because of the procedural posture of the *Bryan* action, we remand without addressing any of the FEHA defenses. By contrast, in *Hogya*, the district court's final judgment is before us, and we may affirm that judgment if we conclude that, at trial, UPS satisfied one of FEHA's defenses to liability.

---

[10]Nor is it relevant to the threshold determination of disability that UPS ultimately cannot be liable for enforcing DOT requirements that exclude monocular individuals from driving particular vehicles. *Cf. Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 522-23 (1999) (noting that whether the plaintiff could meet DOT's standards "goes only to whether petitioner is qualified and whether respondent has a defense based on the DOT regulations" and evaluating whether the perceived inability to obtain DOT certification demonstrates that the plaintiff was substantially limited in working).

[11]UPS argues that, because this appeal is interlocutory, the panel may not affirm under a different rationale. "But the appellate court may address any issue fairly included within the certified order because it is the *order* that is appealable, and not the controlling question identified by the district court." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) (internal quotation marks omitted). At minimum, the court may address any aspect of the general question certified by the district court—whether Plaintiffs demonstrated a limitation in working under FEHA. *See supra* p. 13280.

II. *UPS satisfied FEHA's safety-of-others defense.*

[8] FEHA "does not prohibit an employer from refusing to hire or discharging an employee . . . where the employee, because of his or her . . . disability . . . cannot perform [the job's essential] duties in a manner that would not endanger . . . the health or safety of others even with reasonable accommodations." Cal. Gov't Code § 12940(a)(1). This aspect of the statute has been expressed in the FEHC's regulations (and in the Commission's decisions) as the safety-of-others defense:

> It is a permissible defense for an employer or other covered entity to demonstrate that after reasonable accommodation has been made, the applicant or employee cannot perform the essential functions of the position in question in a manner which would not *endanger the health or safety of others to a greater extent than if an individual without a disability performed the job*.

Cal. Code Regs., tit. 2, § 7293.8(d) (emphasis added).[12] The employer must prove this affirmative defense by a preponderance of the evidence. *Raytheon Co. v. Cal. Fair Employment & Hous. Comm'n*, 261 Cal. Rptr. 197, 203 (Ct. App. 1989).

[9] Applications of this defense by the California courts and the FEHC convince us that the defense is satisfied with respect to Intervenors here. The decisions demonstrate that

---

[12]The safety-of-others defense has no direct analogue in the ADA. The closest parallel is to the ADA's direct-threat defense, which we have described as "a very narrow permission to employers to exclude individuals with disabilities *not* for reasons related to their performance of their jobs, but because their mere presence could endanger others with whom they work and whom they serve." *Morton v. United Parcel Serv., Inc.*, 272 F.3d 1249, 1259 (9th Cir. 2001). By contrast, the primary concern of FEHA's safety-of-others defense is to avoid dangers caused by an individual's performance of the job. *See* Cal. Code Regs., tit. 2, § 7293.8(d).

even a modest increase in the risk that a problem will occur is significant when the potential consequences of that problem are very serious. For example, the Commission decided that a 25 percent chance that a truck driver's herniated discs could cause symptoms in the future, possibly including paralysis or disabling pain, was sufficient to establish a "significant potential for harm to others" in the event that the symptoms appeared while he was driving was sufficient to establish the defense. *DFEH v. Di Salvo Trucking Co.*, Dec. No. 87-14, 1987 WL 114862, at *8 (Cal. F.E.H.C. 1987). Likewise, because "[c]onstant mental alertness is an essential requisite of operating a locomotive and train," a train engineer who was susceptible to dizziness and blackouts posed a significantly greater danger to others despite his "extensive and completely safe record as an engineer." *DFEH v. S. Pac. Transp. Co.*, Dec. No. 80-33, 1980 WL 20906, at *6 (Cal. F.E.H.C. 1980) (precedential decision); *cf. Quinn v. City of L.A.*, 100 Cal. Rptr. 2d 914, 921 (Ct. App. 2000) (stating that the "public safety concerns involved with the day-to-day work of a patrol officer" made a police department's hearing requirements "eminently reasonable").

Similar safety considerations justified the imposition of weight requirements for ambulance drivers in *McMillen v. Civil Service Commission*, 8 Cal. Rptr. 2d 548 (Ct. App. 1992). The employer in that case presented studies demonstrating that "excess fat" or obesity could affect agility and the ability to lift and climb, cause fatigue, and create a risk of back injury; "[b]ecause sudden incapacitation of an ambulance driver could be life-threatening," the employer imposed weight limitations on its ambulance drivers. *Id.* at 549. The court held that such limitations "may be prescribed by an employer where there is a rational basis for such limitations, as shown by supportive analytical factual data rather than stereotypical generalizations." *Id.* at 550. The employee's failure to meet the weight requirements "posed a risk which, based on the studies the department had before it, could not be countenanced." *Id.* at 551. The court stated:

> We agree with the trial court's observation that the department need not wait for disaster to strike before taking action: the department owes a duty to the public and its employees affirmatively to avert disaster, rather than simply wait and hope it does not occur.

*Id.*; *see also Hegwer v. Bd. of Civil Serv. Comm'rs*, 7 Cal. Rptr. 2d 389, 397-98 (Ct. App. 1992) (finding that statistical studies justified weight limitations for paramedics under FEHA, that the [employee]'s loss of agility and endurance demonstrated a danger to the safety of others, and that "[g]reater imminency of disaster is not required to meet standards of reasonableness").

Finally, in a decision frequently cited by Intervenors in support of their threshold showing of disability, the FEHC determined that a monocular applicant for a position as a police officer "posed a significantly greater risk to the health and safety of others than a police officer with binocular vision." *City of Merced*, 1988 WL 242649, at * 5. The Merced Police Department presented an "extraordinary showing" through two expert witnesses who testified, with reference to medical publications and vision validation studies, that binocularity was required for the safe performance of the job of police patrol officer. *Id.*

We acknowledge that FEHA's safety-of-others defense requires an individualized showing that safety would be compromised by each Intervenor's performance of driving duties. *See, e.g.*, *Sterling Transit Co. v. Fair Employment Practice Comm'n*, 175 Cal. Rptr. 548, 551 (Ct. App. 1981) (applying the danger-to-self defense); *DFEH v. City of San Jose*, Dec. No. 84-18, 1984 WL 54298, at *10 (Cal. F.E.H.C. 1984) ("Like the defense of danger to the complainant, the defense of danger to others must be specific to the particular complainant before us."). But the FEHC also has stated that "[t]here is no ground for barring the application of categorical evidence" to individualized defenses, such as the safety-of-

others defense. *DFEH v. Orange County Sheriff-Coroner Dep't*, Dec. No. 82-26, 1982 WL 36770, at *4 (Cal. F.E.H.C. 1983). Categorical evidence can be relevant—as it was in *McMillen* and *City of Merced*—so long as it provides a sufficiently strong showing that people whose impairments closely match the complainant's are disqualified. *Id.* at **4-5. In *Orange County*, where a study "clearly indicate[d]" that individuals with "20/200 or worse uncorrected vision can be expected to pose significantly greater danger to other persons by driving patrol cars and in shoot/no-shoot situations," the Commission was able to infer that the applicant herself would pose such a danger. *Id.* at *6. In *McMillen*, the court held that an individualized showing that the employee did not meet generally applicable weight requirements themselves sufficiently demonstrated a safety risk, where the generally applicable requirements were a reasonable means of ensuring public safety. 8 Cal. Rptr. 2d at 551.

We agree with UPS that the safety-of-others defense is established here. The district court concluded that "the literature generally supports the proposition that monocular drivers as a whole are involved in more accidents than others as a whole," although "not dramatically more." *EEOC*, 149 F. Supp. 2d at 1144. In particular, the district court recognized that peripheral vision plays an important role in avoiding accidents and that "the monocular driver has less opportunity to see a child or any other pedestrian or cyclist or car darting from the impaired side." *Id.* at 1142 (emphasis omitted). Just as the employer in *McMillen* demonstrated that excess weight compromised an emergency worker's ability to perform safely, UPS demonstrated that decreased peripheral vision compromises a driver's ability to perform safely as compared to a person without that impairment.

Yet, although significant risks are posed by the absence of peripheral vision in one eye, not all monocular individuals lack peripheral vision in the affected eye. Hogya, for instance, has "useful sight in [his affected] eye at the periphery." *Id.* at

1151. And the district court found that the absence of *central* vision acuity in one eye does not affect an individual's ability to drive safely, so long as the individual retains peripheral vision. *Id.* at 1142, 1144. According to the expert evidence relating to central-vision acuity, the court found, "one excellent eye is as good as any two." *Id.* at 1142. We agree with UPS that, for purposes of FEHA's safety-of-others defense, this finding is clearly erroneous. The Vision Protocol requires drivers to retain visual acuity of at least 20/200 in the affected eye because 20/200 vision is the threshold for "gross object perception" and, thus, "even in the case of a [driver] getting something in the better eye, he/she would still be able to get to a safe stop until the vision cleared in the better eye." *Id.* at 1131; *see also Orange County*, 1982 WL 36770, at *6 (finding that people with 20/200 or worse uncorrected vision pose a significantly greater danger to others while driving patrol cars). This reasoning, which the district court found to have "laid the foundation" for UPS's Vision Protocol, was dismissed because it was based on the "anecdotal experience" of Dr. Witkin, who developed UPS's Vision Protocol, rather than on statistical studies. *EEOC*, 149 F. Supp. 2d at 1132.[13] But, apart from that criticism, the district court did not address the merits of Dr. Witkin's reasoning in reaching its conclusion that the Vision Protocol is "unnecessarily onerous in requiring" a minimum level of central vision in both eyes. *See id.* at 1142-43. The absence of supportive studies does not make an expert's opinion, which generally is a conclusion drawn from clinical experience, per se unreasonable. In view of the seriousness of the potential consequences of a complete loss of central vision while driving, we conclude that UPS's requirement of some central vision in both eyes is reasonable.

[10] It is undisputed that none of the Intervenors meets the central vision acuity standard set forth in the Vision Protocol.[14]

---

[13]Dr. Witkin, the doctor who developed the Vision Protocol, did not testify at trial. *EEOC*, 149 F. Supp. 2d at 1141.

[14]Intervenors argue that they could overcome any safety risks by training in UPS's renowned defensive-driving training program, but they do

This fact is a sufficiently individualized determination to satisfy the safety-of-others defense because, as in *McMillen*, each applicant was tested for compliance with specific criteria that themselves are a reasonable "means of ensuring the safety of its employees and members of the public." 8 Cal. Rptr. 2d at 551. The district court acknowledged that the potential for traffic fatalities is a serious problem. *EEOC*, 149 F. Supp. 2d at 1169. Indeed, the California decisions discussed above suggest that the potential for endangerment of human life justifies safety-based restrictions even when the risk of occurrence is modest. For that reason, we conclude that Intervenors' failure to meet the Vision Protocol demonstrates that their performance of the duties of a full-time package car driver would endanger the health and safety of others "to a greater extent than if an individual without a disability performed the job," Cal. Code Regs., tit. 2, § 7293.8(d).

**[11]** We do not suggest that *any* vision protocol would pass muster. But because the UPS Vision Protocol rests on objective and statistical evidence that monocular drivers are involved in somewhat more accidents than binocular drivers, because the risk of harm to others is high, because the UPS standard does not categorically exclude monocular individuals from working as full-time package car drivers, and because the application of the Protocol is individualized to each employee or applicant, we are persuaded that UPS must prevail on its safety-of-others defense.

III.   *The award of attorney fees was an abuse of discretion.*

The district court made an error of law, and therefore abused its discretion, in awarding attorney fees to UPS under California Government Code § 12965. Aside from that error

---

not explain how this reasonable accommodation would eliminate the physiologically based safety hazard addressed by the requirements of *some* peripheral vision and *some* central vision acuity in the affected eye.

in identifying a source of law, however, the district court acted within its discretion, and it is free to reconsider the question on remand.

We begin by summarizing the relevant facts. The *Bryan* action was filed in May 2001. To ascertain that Plaintiffs had exhausted their administrative remedies before filing a complaint, Plaintiffs' counsel relied on a list of "Class Members" from the *EEOC* action. The district court assumed that it was reasonable for Plaintiffs' counsel to have relied on that list initially. But during depositions in November 2003, Bryan testified that he had not filed a complaint with either the EEOC or the California Department of Fair Employment and Housing. Similarly, in his deposition Torres testified that he had not filed a complaint with the state agency and could not remember whether he had filed with the EEOC. One day after the depositions ended, Plaintiffs' counsel filed a motion for summary adjudication that included the Bryan and Torres claims.

Plaintiffs' counsel made various overtures toward dismissing the Bryan and Torres claims during December and January, but ultimately did not do so until February 10, 2004. Between November 2003 and February 2004, when Plaintiffs' counsel ultimately filed the voluntary dismissal of the Bryan and Torres claims, Defendant subpoenaed the EEOC for files relating to Bryan and Torres, filed their opposition to Plaintiffs' motion for summary adjudication, filed their own motion for summary judgment, and corresponded with Plaintiffs' counsel regarding the text of the voluntary dismissals.

Following the voluntary dismissals, UPS filed a motion for attorney fees under California Government Code § 12965. The district court awarded Defendant attorney fees of $25,000, to be paid by Plaintiffs' counsel, for work done on the Bryan and Torres claims between the date of the depositions and the date of the voluntary dismissal. (The amount

represented one-third of UPS's cost to prepare the response to Plaintiffs' motion and its own summary judgment motion.)

**[12]** The district court was within its discretion to determine that some kind of sanction was appropriate, because Plaintiffs continued to litigate their claims after Plaintiffs' counsel knew that Bryan had not exhausted his remedies and had reason to suspect that Torres had not. *See Bond*, 57 Cal. Rptr. 2d at 919 (noting that a prevailing defendant may be awarded fees if the plaintiff's action was unreasonable, frivolous, meritless, or vexatious). But the district court misunderstood *Hon v. Marshall*, 62 Cal. Rptr. 2d 11 (Ct. App. 1997). In *Hon*, the defendant in a FEHA action was granted summary judgment because the plaintiff failed to exhaust her administrative remedies:

> This case . . . raises a narrow question which is apparently one of first impression in this state, *whether a defendant who is granted summary judgment because of such a jurisdictional defect qualifies as a "prevailing party"* entitled to an attorney fee award under section 12965.

*Id.* at 13 (emphasis added). We do not read *Hon*, as the district court did, merely to "express[ ] a general preference toward not awarding attorney's fees when dismissal is based on non-exhaustion of administrative remedies." Instead, the court in *Hon* interpreted the statutory term "prevailing party" and held that, when summary judgment is entered without a decision on the merits because the plaintiff failed to exhaust, the defendant simply is not a "prevailing party" that is eligible for fees under § 12965. *Id.* at 15-16; *see also* Cal. Civ. Proc. Code § 128.6(a) ("Every trial court may order a party, the party's attorney, or both to pay any reasonable expenses, including attorney's fees, incurred by another party as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay.").

**[13]** Although *Hon* precludes an award of attorney fees under § 12965, and the fee award must be reversed, it is clear from the record that the district court would have awarded the same sanctions under a different provision, if one is available. We do not foreclose that possibility on remand. *See Hon*, 62 Cal. Rptr. 2d at 15-16 (remanding to allow trial court to conduct further proceedings on the issue of sanctions, should the court deem it appropriate).

## CONCLUSION

Intervenors are limited in the major life activity of seeing, and Plaintiffs are limited in the major life activity of working. Consequently, we AFFIRM the district court's partial summary judgment for Plaintiffs in the *Bryan* action, No. 04-16403, and award costs on appeal to Plaintiffs. With respect to Intervenors in the *Hogya* action, No. 03-16855, we conclude that UPS satisfied FEHA's safety-of-others defense and therefore we AFFIRM the district court's judgment on that alternative ground and award costs on appeal to Defendant. Finally, in No. 04-15928, we REVERSE the district court's decision to award attorney fees to UPS under California Government Code § 12965 and REMAND and award costs on appeal to Plaintiffs.